MARTIN LIPPMAN,

*vs.*

KEHOE STENOGRAPH COMPANY.

*New Castle, October* 4, 1916.

The act of a director of a corporation in signing, before the organization of the company, a blank form of waiver of notice to him of directors' meetings was insufficient to validate, as against any other stockholder or director, a meeting, subsequently held, at which he was not present and of which he had no notice.

Where two directors of a corporation made up minutes of what might have happened at an imaginary directors' meeting, initialing them, and forwarding them to another director, who also signed and initialed them, all parties knowing that the alleged minutes contained false statements and statements as to which the third director had no knowledge, the signature of the letter was ineffective, unless subsequently ratified at a valid meeting.

Where one of three directors believed the minutes of an alleged meeting, at which he had not been present, and their validity, to be conditional on a subsequent ratification at another meeting, their validity was conditional.

Directors of a corporation were not estopped to deny the validity of an alleged directors' meeting, or to repudiate it, where such meeting was not legally held, and the minutes thereof, concocted by two of the three directors, were signed by the directors with knowledge of their falsity.

Under General Corporation Act, providing that the business shall be managed by a board of not less than three directors, each of whom shall own in his own right not less than three shares of stock, a person, who became the assignee of an incorporator's subscription to the capital stock of the company, acquired status as a stockholder, and became eligible to election as a director, if not otherwise ineligible or disqualified.

When a stockholder assigned his certificate in blank, not having sold it, and delivered it to another, not a purchaser, with no intention of either party that the interest of the transferror should terminate, and no transfer of the stock was made on the books of the company, the stockholder did not thereby cease to be the owner of the stock in his own right, or disqualified to be a director under General Corporation Act, § 9.

When ownership of shares in a corporation is necessary to qualify as a director, a party who sells and assigns his shares to another disqualifies himself.

Where incorporators elected six directors by ballot, three of whom were ineligible because not stockholders, a directors' meeting of two of the three eligible directors, pursuant to notice to all, was valid, despite the presence of the ineligible members.

The provision of General Corporation Act, § 32, that directors may hold their meetings outside the State, if the by-laws so provide, does not apply to a case, where, in the certificate of incorporation, the right of directors to hold meetings outside the State is taken, as authorized by *Sections* 3 and 5, *paragraph* 8.

A court of equity should not invalidate the proceedings of a board of directors at a meeting held outside the State when every stockholder and director had notice of the place of the meeting and either attended in person or failed to object that the place was outside the State.

In general, directors may hold their meetings and transact business outside the limits of the State wherein the company is incorporated, unless it is otherwise prescribed by its charter or by-laws.

A person who maintained in Pennsylvania a home for himself and wife, habitually sleeping and taking part of his meals there, who had been officially denied the right of citizenship in Delaware, on the ground that he was not a resident, was not a resident of Delaware within the General Corporation Act, § 9, requiring that at least one director of a corporation be a resident of Delaware, though he was habitually in attendance at his place of business in Delaware during business hours, as a man is a "resident" of the locality in which he occupies, with his wife, a dwelling house, which he regards as his home, and where he habitually sleeps and stays when not engaged in his business, and is none the less a resident of such locality because his place of business is elsewhere.

The fact that not one of the directors of a corporation was a resident of Delaware, as required by General Corporation Act, § 9, requiring one resident member, did not invalidate their election or affect the validity of their acts as a board.

STATEMENT OF THE CASE.  The purpose of the bill is to permanently enjoin the sale and transfer on the books of the company of three shares of stock of the Kehoe Stenograph Company, the ownership of which shares is claimed by the complainant as the assignee thereof from Abraham M. Ackerman.  The stock was advertised for sale by certain persons

claiming to be officers of the company for non-payment to the company of the par value thereof. A restraining order enjoining the sale was made, but notwithstanding the order the shares were offered for sale, the seller being ignorant of the order, and in default of bidders were forfeited to the company. Thereupon a supplemental bill was filed to restrain a transfer of the shares.

An answer for the company was filed to the original bill by Julius Strauss, as president, and Abraham M. Ackerman, as secretary, under the seal of the company, and by it the allegations of the bill were admitted to be true, and a like answer was filed to the supplemental bill. Later a petition was filed purporting to be that of the company, executed by H. C. Dunlap, as the president thereof, for leave to file an answer for the company, on the ground that he is the real president and those he represents are the real officers entitled to make a real and substantial defense to the suit.

After a full hearing on the affidavits, the Chancellor having reached certain preliminary conclusions upon the facts then before him, as appears by the report thereof, *ante p.* 80, 95 *Atl.* 895, permitted the answer executed by H. C. Dunlap to be filed as the answer of the company. The case was then more fully heard by the Chancellor upon testimony taken before the Chancellor by agreement of counsel.

The facts are as set forth in the opinion above referred to, except as stated in the following opinion, which contains the new facts deemed relevant.

*James I. Boyce,* for the complainant.

*James M. Tunnell,* and with him *John J. O'Connor,* of the New York City Bar, for the defendant.

THE CHANCELLOR. The right of the complainant to relief in this case depends, as will appear herein, upon whether the board of directors which elected H. C. Dunlap as president of the defendant company was the *de jure* board, there being two rival boards each pretending to be the *de jure* board of directors, and each carrying on independently of the other the affairs of the company.

The differences began after the first meeting of the incorporators. The company was incorporated under the general corporation law of this State, by the filing of a certificate of incorporation dated October 9, 1913, and the subsequent recording thereof on the same day. By this certificate there were three incorporators, R. Y. Slater, Abraham M. Ackerman and J. Merrick Horn, each of whom subscribed for three shares of stock. On October 9, 1913, a meeting of incorporators was held in Wilmington, Delaware. Horn had previously assigned his subscription to E. B. Waples.

At the hearing on the prior motion respecting the filing of the answer (*ante p.* 80; 95 *Atl.* 895), I expressed my reasons for affirming the validity of that meeting, and both sides of the case assume the validity thereof. It is not necessary, therefore, to refer again to the regularity of that meeting.

At the meeting of incorporators, subscriptions to the capital stock were received, R. Y. Slater for four shares and Ackerman and Horn each for three shares. An agent was selected to keep the Delaware office of the company and the books required by law. The directors were authorized to issue stock, and to purchase property and issue full paid stock in payment therefor. An election for directors was held and six persons were elected by ballot to hold office until their successors should be elected and qualified. The persons elected were R. Y. Slater, Abraham M. Ackerman, H. C. Dunlap, Ashby L. Biedler, W. J. Kehoe and E. B. Waples. No other business was then transacted. Of these six persons, Slater and Ackerman were two of the three incorporators, and Waples was the assignee of the subscription of the third incorporator, Horn. The other three persons at that time had no legal connection with the company as stockholders, subscribers to stock, or otherwise.

By the Act under which the corporation was created the signers of the certificate of incorporation have the direction of the affairs of the corporation until the directors are elected (*Section* 8). There was no pretence of any meeting of the directors or other corporate action until October 29, 1913. There were then no by-laws, and the power to make them was given to the directors by the certificate of incorporation, as

authorized by the Act (see *Section* 12). On October 29, 1913, R. Y. Slater and Ackerman went together to the office of the Delaware Registration and Incorporators' Company in the City of Wilmington, that being the place in Delaware designated as the principal office of the Kehoe Stenograph Company, to hold a meeting of the directors. Waples was absent, and had in fact had no notice of the proposed meeting. Miss Murphey, the representative of the registration company, advised the two men that they could not hold a meeting, and after a few minutes they both left the office and the City of Wilmington.

It will be necessary to examine first the corporate proceedings which the Dunlap faction claims show that the board which elected H. C. Dunlap president is the *de jure* board, and as an element therein to determine whether there was really a meeting of the board of directors, and a valid one, held on October 29, 1913, as claimed by the complainant.

The complainant relied on minutes produced by the other group of persons claiming to be the *de jure* board of directors by whom Strauss was elected president of the company, purporting to be minutes of incorporators held October 29, 1913. These minutes stated that the first meeting of the directors of the company was held at the registered office of the company in Wilmington, on October 29, 1913, at six o'clock p. m., pursuant to a waiver of notice thereof, signed by all the driectors; but in fact the waiver was undated and was signed only by Waples, Dunlap, R. Y. Slater and Ackerman. It was also there stated that Slater, Ackerman and Waples were present as a majority of the board; that Kehoe had declined to be a director; and that the resignation of Biedler had been tendered and accepted. Furthermore, that Julius Strauss had been elected a director, and Strauss was then elected president and Ackerman secretary and treasurer; that by-laws were adopted; and that an offer to sell to the company certain patents was accepted. These minutes were signed by R. Y. Slater, Ackerman and Waples. As a fact Waples was not present, and had in fact had no notice of the meeting.

In the preliminary opinion it was stated by me that

Waples had had notice of the meeting, but had after the meeting signed a waiver of notice of it. This was incorrect. Waples prior even to the organization of the company signed a paper which when signed was only a blank form of waiver, and when signed did not contain the name of the company, the date, purpose or any detail necessary to make it applicable to the meeting or even the corporation in question. It was his custom, as an officer of the company engaged in the business of acting as the representative of those desiring to become incorporated under the laws of Delaware to sign such blank form for use in his absence from the office of his company in case he should be named as an incorporator or director of a corporation. Such an act is in legal effect no waiver, and has no legal effect as such, except against the company with respect to persons dealing with the corporation as such. In itself it was ineffective to validate the proceedings of that pretended meeting of October 29, 1913, certainly as against any other stockholder or director. If, therefore, as stated in my preliminary opinion, the signing subsequent to a meeting of a waiver of notice of the meeting was ineffective, upon the authority cited, and which point has not been controverted by the solicitor for the complainant so far as I have observed, then the signing before the incorporation of a blank form for waiver of notice was equally ineffective.

It was shown, moreover, that both R. Y. Slater and Ackerman were advised by Miss Murphey, an employe of the chartering company, that they could not hold the meeting on October 29, 1913, and the reasons therefor, so that both acted with notice. Indeed, their conduct while at the office of the Delaware Registration and Incorporators' Company indicated that there was no meeting held, nor did Slater or Ackerman then pretend that one was held. A few days later Slater and Ackerman together made up minutes of what might have happened, signed and affixed the initials of their names thereto, and it was forwarded to Waples, who also signed them and affixed his initials thereto. The signature of Waples was as ineffective as it was inexplicable, for the alleged minutes contained statements which Slater, Ackerman and Waples all

know to be false, and other statements as to which Waples had no knowledge. It is quite clear that Slater did not regard these minutes as valid proceedings unless and until they had been subsequently ratified at a valid meeting, for he so testified, and also testified without contradiction that Ackerman regarded a subsequent ratification as necessary. Slater's testimony to this effect is not in conflict with statements made by him in any affidavit filed in the case.

Inasmuch as both Slater and Acerkman had been advised that the meeting was a nullity; and Waples must have known it was when he signed the minutes, it is made even more certain that all of them considered, or must have considered, a subsequent ratification of them as necessary to their validity. But if only one of the three believed the minutes and the validity thereof as such to be conditional on a subsequent ratification at another meeting, then it remained conditional. Unanimity alone, if anything, can validate such proceedings as between the stockholders on the principle of estoppel, or otherwise. The subsequent conduct of R. Y. Slater and Waples respecting the meeting of October 29, 1913, both of whom repudiated the validity thereof, is consistent with the conditional character of the minutes of that meeting.

Inasmuch, then, as there was no legal meeting on October 29, 1913, and at most an effort by the only persons then legally interested in the corporation to take action conditionally as the only directors, it follows that neither R. Y. Slater nor Waples were estopped to deny the validity of the meeting, or repudiate it; and it is equally unimportant whether Kehoe, Biedler, or Dunlap could question the validity of the meeting if it was questioned by either R. Y. Slater or Waples; and if the action was not only not ratified, but actually and duly repudiated and rescinded by the directors at a lawfully convened meeting, then it is as if there had been no pretence even of a meeting on October 29, 1913.

There was no pretence that on December 30, 1913, there was a meeting of the directors of the board of which Strauss claimed to be president, or that any business was then transacted, and no legal pertinent conclusion can be drawn from what there took place.

Concerning the meeting of January 21, 1914, held in the City of Philadelphia, Pennsylvania, three reasons were urged by the solicitor for the complainant to show that it was illegal and invalid, and they will be considered. The first reason was that there was not a quorum present, R. Y. Slater being the only stockholder and the only qualified director present, Waples having assigned his shares and Dunlap, Biedler and Kehoe, not being stockholders and even if Dunlap, Biedler and Kehoe held qualification shares and were so eligible, Kehoe did not attend, and R. Y. Slater, Biedler and Dunlap did not without Waples constitute a quorum of six.

Was Waples on January 21, 1914, disqualified as a director by an assignment of his shares? By *Section* 9 of the General Corporation Act, the business of the corporation shall be managed by a board of not less than three directors, "each of whom shall own in his own right not less than three shares of capital stock." Waples by the assignment of Horn, an incorporator, dated October 9, 1913, became the assignee of Horn's subscription to the capital stock of the company, and this transfer gave Waples a status as a stockholder, and if he was not otherwise ineligible or disqualified, made him eligible to election as a director.

In the case of *Allen v. Stewart, et al.,* 7 *Del. Ch.* 287, 298, 44 *Atl.* 786, 788, the court in considering the necessity of an actual transfer of stock on the books of the corporation to effect a valid transfer thereof, made a distinction between a transaction of a stockholder with a third person, and the rights of a stockholder as to the corporation, saying that the statute making shares transferable on the books of the company was "applicable only to the relation existing between the corporation and its stockholders—to the questions, who shall vote, to whom dividends shall be paid, and to enable the corporation to protect any lien it may have upon the stock as between itself and a stockholder indebted to it." In other words, as between individuals the assignee of shares acquired title to the shares as against the assignor independent of the actual transfer thereof on the books of the company; but that the company was not bound thereby and the relation of the assignor

to the company was not affected by the assignment until a transfer was made.

The case cited does not sustain the position of the complainant, that the assignment was valid and effective from the date of the assignment, if the contention is that from the date of the assignment Waples was disqualified. There was no consideration between Waples and Strauss or the company for the delivery by Waples of his certificate of stock, and no transfer thereof had been made on the books of the company prior to January 21, 1914, and there was no testimony that there was any significance in the act. Certainly no person connected with the company as stockholder, or officer, contemplated that Waples had terminated all interest in the company as a stockholder, for all of them regarded him as the only stockholder resident in Delaware, and as the only person who could comply with the statute requiring that at least one of the stockholders be a resident of the State of Delaware.

When a stockholder assigns in blank his certificate of stock, not having sold the same, and delivers it to another, not a purchaser, but with no intention on the part of the transferor, or of the person to whom the certificate was delivered, that the interest of the transferor in the stock should terminate, and no transfer of the stock has been made on the books of the company, the stockholder does not thereby cease to be the owner of the stock in his own right, or disqualified to be a director of the company. While the assignment in blank of a certificate of stock and the delivery thereof to a purchaser of the stock impliedly authorizes the buyer to fill in his own name as the assignee and to transfer the shares on the books of the comapny, that situation did not exist respecting Waples' stock.

It appears clearly from the testimony that upon the request of Ackerman, acting for the company and not individually, Waples about the middle of October, 1913, signed a blank transfer of the three shares of the company theretofore issued to him, and sent it by mail to Ackerman pursuant to the request, and no transfer of it on the books of the company was in fact made before January 21, 1914; and that neither Waples, or any officer of the company, before January 21,

1914, considered that in so doing Waples had disqualified himself to be and act as a director of the company. Waples so stated explicitly, and by giving Waples notice of meetings subsequent to January 21, 1914, the officers of the company evinced the same view. There is, however, no principle of estoppel applicable in this connection.

As between individuals buying and selling shares of stock, a delivery of a certificate of stock so assigned passed to the buyer a right to insert his name as assignee, and by authority of *Allen v. Stewart, et al.,* 7 *Del. Ch.* 287, 44 *Atl.* 786, gave the buyer rights as against the assignor. Of course, when ownership of shares is necessary to qualify as a director one who sells and assigns his shares to another disqualifies himself. But that general principle has no application here. An assignment in blank may, or may not, terminate the interest of the assignor in the stock, depending on the purpose with which it was done, and no authority is cited to the contrary. The conduct of Waples in acting as a director after assigning the stock, and of the persons to whom the certificate was sent are inconsistent with the idea that Waples terminated his interest in the company or the shares of stock, and on the contrary are consistent with a continuance of his relation to it both as stockholder and director. It may not be a commendable thing for a stockholder so to put in the power of another person to disqualify him as a director, but the case before the court is not one of morals, but legal rights.

Furthermore, there being no sale by Waples of his shares of stock, and no other purpose in assigning it in blank than that stated by him, and it not being shown that Ackerman, to whom Waples sent the certificate, so assigned, or anyone else, had any interest in the shares, Waples was not by such assignment and delivery of the shares disqualified from acting as a director, and his continuance to so act and his so acting at the meeting of January 21, 1914, was to that extent a retraction of authority to transfer the shares on the books of the company.

Were Dunlap, Biedler and Kehoe qualified to act as directors in the meeting of January 21, 1914? Admittedly they had been elected directors on October 9, 1913, at the organization

meeting.    The incorporators then having authority to do so, determined that the number of persons to constitute the board of directors should be six, and elected by ballot six persons as such, viz: R. Y. Slater, Ackerman, Dunlap, Beidler, Kehoe and Waples.    Three of them, R. Y. Slater, Ackerman and Waples were on January 21, 1914, admittedly stockholders.    Dunlap, Biedler and Kehoe had not theretofore qualified as directors so far as I can see, neither of them having become owners of stock of the company.    True, R. Y. Slater reported at the meeting held that day, that he as temporary treasurer had received from each of them payment for three shares, but he had not been elected temporary treasurer, and so was probably without authority to so act.    All six of the persons elected by the incorporators as directors had had notice of the meeting.    Four of them, R. Y. Slater, Waples, Dunlap and Biedler, attended, and Ackerman refused to attend, protesting against the legality thereof.    Kehoe did not attend and sent a telegram that it was impossible for him to get to Philadelphia, the city where the meeting was held.    After reading the call of the meeting a temporary chairman and secretary were elected.    R. Y. Slater, as temporary treasurer, reported the receipt of moneys from all of the six directors, except Ackerman, in payment in full for the three shares of stock each, and his report was adopted, and he was directed to pay the moneys to the permanent treasurer when elected and qualified.    Those present proceeded to elect unanimously permanent officers, Dunlap as president (who was then duly sworn in), Kehoe vice-president, and G. A. West, secretary, and E. B. Warner, treasurer, though they were not then stockholders.    By-laws were adopted, the proceedings of the alleged meeting of October 29, 1913, were repudiated and nullified, and a seal and form of stock certificate adopted. Other business was transacted relating to the purchase from Kehoe of patents for the stenograph machine, and copyrights for the system of stenography, but it is not important or necessary to consider these other matters, which do not affect the right of the corporation to sell the shares of stock which Ackerman had and the sale or forfeiture thereof, which Lippman, the complainant, seeks to upset.

At the preliminary stage of the case it was urged that neither Dunlap, Biedler nor Kehoe were on October 9, 1913, qualified to be directors because they were not then stockholders, and this was fully argued.   My position on this point, as stated in the earlier opinion, is unchanged, and is confirmed upon a fuller consideration of the case.   If their election was ineffective because they   were   not stockholders, then there were but three directors on January 21, 1914, viz: R. Y. Slater, Ackerman and Waples, and a majority of them were present at the meeting on January 21, 1914, qualified to act for the corporation either as incorporators or directors, in either capacity constituting a majority. If, on the other hand, it was not necessary that ownership of stock should precede election, though both election and ownership must precede action, provided the qualifying shares be acquired within a period of time reasonable under all the circumstances, still it does appear that on January 21, 1914, and before acting as such, all six of the persons named on October 9, 1914, as directors had qualified by ownership of stock, and under the circumstances they had qualified within a reasonable time.   The same result would be reached by holding that though not qualified when elected, or before January 21, 1914, R. Y. Slater, having before that time no right to act as temporary treasurer, still by the approval of his action in taking the money for the shares those persons who paid became stockholders, and as his qualification preceded their acting as such at the meeting they were validly participants at that meeting. My present view, therefore, is that heretofore taken, viz: that, so far as the qualifications of those who participated in the meeting were concerned, this was the first valid meeting of those persons elected on October 9, 1913, as directors, and the only valid meeting for the organization of the directors so named, and that those present and acting as such were qualified to so act.

The minutes of the meeting of January 21, 1914, also disclose that even if Biedler had resigned as director his resignation had never been acted upon by the corporation, or any official body representing it, and at the meeting it was with-

drawn, which removed any possible result of his having signed an unaccepted resignation.

In my opinion, therefore, there was at the meeting on January 21, 1914, in Philadelphia a quorum of the persons elected and then qualified to act as directors of the company, viz: Waples, R. Y. Slater, Dunlap and Biedler, and the meeting was not illegal and invalid for lack of a quorum.

The second objection was that if the by-laws of October 29, 1913, were invalid, the company had no by-laws, and the meeting could not be held outside the State of Delaware. Was the meeting of January 21, 1914, illegal because held out of the State of Delaware? By both the original and amended certificate of incorporation the meetings of the directors could be held outside the State of Delaware. By section three and by paragraph eight of section five of the General Corporation Act, the provision respecting the place of meetings was made a part of the fundamental law of the corporation, and the provision in question is not contrary to the laws of this State in any true sense. The provision in section thirty-two, which says that directors may hold their meetings outside this State if the by-laws so provide, does not apply to a case where in the certificate of incorporation the right to hold meetings of directors outside the State is taken, as authorized by earlier sections of the same Act. Certainly a court of equity should not invalidate the proceedings of a board of directors at a meeting held outside the State when every stockholder and director of the corporation had notice of the place of the meeting and either attended in person or failed to make that objection. No question of morals or public policy is involved, and it would be highly unreasonable to invalidate the meeting otherwise valid because of the place in which it was held.

In general, directors may hold their meetings and transact business outside the limits of the State wherein it is incorporated, unless it is otherwise prescribed by its charter, or by law. 1 *Morawetz on Private Corporations* (2d Ed.) § 533. Where by the articles of association it was provided that the business of the company should be conducted by not less than five or more than seven members, the words were held to be imperative and not man-

datory, and action taken at a meeting at which less than five were present was held to be invalid, for the conduct of the business had been entrusted to a certain number of persons, and stipulated that there should not be less than that number. *In re Alma Spinning Co., L. R. 16 Ch. Div.* 681 (1880). There is nothing, then, in the general law, or the charter of the Kehoe Stenograph Company, which corresponds to the articles of association in England, that would invalidate the proceedings of a meeting of directors held out of the State of Delaware. This question was carefully considered early in the progress of the case, and after a re-examination thereof I have not changed my opipion.

The third objection was that none of the members of the board of directors was a resident of the State of Delaware. Whether Waples was or was not a resident of Delaware was much discussed by counsel, as though the important question was whether ownership by him of stock was necessary to qualify him as a director. On this something will be said herein later. It appeared that Waples had a home in Philadelphia, a dwelling house where he and his wife lived, there being no children of the marriage. There Waples habitually slept and took his meals; and there he usually stayed, except when in the office of the Delaware Registration and Incorporators' Company in Wilmington, of which he was the manager. His right to register as a voter at elections in Delaware had been denied by the court, because not a resident and so not a citizen thereof. His place of work was Delaware, his home in Philadelphia. Was he a resident of Delaware within the general meaning of the word, or any peculiar definition thereof appropriate to the purpose of the statute?

In some cases cited the meaning given to the word "residence" is said to depend in part, at least in some cases, on the legislative intent. What is the legislative purpose in requiring that at least one of the directors of a corporation be a resident of Delaware? *Section* 9. Convenience in the service of process on the corporation is not the only reason, for it must maintain in this State a principal office, or place of business, and have an agent resident in Delaware in charge thereof (*see Section* 32), and the name of the place in which it is to be located and

the name of its resident agent must be set forth in the certificate of incorporation (*See Section* 5, *par.* 2). The name of the corporation must be prominently posted at that place under a penalty of a fine (*See Section* 33). If the president resides out of the State, then independent of whether or not there be a resident director service of process may be made on the corporation by delivering a copy of the process to the secretary at his dwelling house, or usual place of abode, or at such office, in the presence of an adult person. Therefore, the residence in Delaware of a director is not important, so far as facility in the service of process on the corporation is concerned. The provision was not enacted in order that some one in Delaware would be interested financially in the company, for the number of qualifying shares for directors is triflingly small. Ability to reach physically and punish, or hold liable, a director for doing certain prohibited acts, such as making illegal dividends (*Section* 35), publishing false statements as to the condition of the company (*Section* 27), or failing to make a certificate as to calls for payment of stock (*Section* 24) could not have constituted the purpose of the Act, for in each of these cases those directors who dissent, or in some other prescribed manner indicate disapproval, are exempt from such liabilities and penalties. It is difficult, therefore, to ascertain what the legislative purpose in this respect was, and at most it is a matter of speculation. Whatever the purpose was, it was evidently considered not to be important for the provision has recently been repealed.

With respect to the residence of the president, the act impliedly defines it as his dwelling house, or usual place of abode, also probably implying that if he has in Delaware no dwelling house, or usual place of abode, he is deemed not to be a resident of Delaware. But this may not be a proper legal conclusion, and is not stated as such.

After considering the many cases cited on the subject, I cannot convince myself that a person who maintains in Pennsylvania a home for himself and wife, who habitually sleeps there, takes part of his meals there, who has been officially denied the right of citizenship in Delaware on the ground that he was not a resident of Delaware, can be deemed to be a resi-

dent of Delaware within the meaning of the Act requiring at least one of the directors of a corporation to be a resident of Delaware, though he be and has for many years been the manager of a corporation whose only place of business is in Delaware, and though he be habitually in attendance at that place of business during business hours. According to the natural, ordinary and usual meaning of the word "resident," a man is a resident of the locality in which he occupies with his wife a dwelling house, which he regards as his home, and where he habitually sleeps and stays when not engaged in his business occupation and is none the less a resident of that locality because his place of business is in another locality. There is no need to strain the natural meaning of the word used in the Act. Waples was not at any time material in this case a resident of the State of Delaware.

Does the fact that Waples is not a resident of the State of Delaware necessarily affect his right to be a director of the company? It was required by the *General Corporation Law* prior to the amendment thereof on March 8, 1915 (28 *Del. Laws*, *c.* 102) that at least one of the members of the board of directors shall be a resident of the State of Delaware (*See Section 9*). Under this law the question is not whether any particular person elected a director is ineligible to election by reason of his not being a resident of Delaware, for residence in Delaware is not a qualification for membership of the board, but whether all the members of the board are non-residents. In other words, the question is, does the non-residence of all the members of a board of directors invalidate the election of all of them; or if not all, which of them are disqualified; and what is the legal effect of the non-residence of all of the directors? None of these questions were discussed by counsel for either of the parties, the discussion being limited to a discussion as to the eligibility of Waples, based on his alleged non-residence.

In my opinion, assuming that Waples was not a resident of Delaware within the purport of the act, and assuming, as was the fact, that none of the five other persons named by the incorporators at the meeting on October 9, 1913, were residents of Delaware, still that this did not either invalidate their elec-

tion as such, or at least did not of itself affect the validity of their acts as a board of directors of the company. There is practically no authority on the subject, and no general principle which seems applicable. A case was cited in 7 *Ruling Case Law, p.* 431, to show that where the charter, or articles of association, provide that the business of the corporation shall be conducted by "not less than five directors and not more than seven," and the number of directors is reduced below five by death, or otherwise, the directors cease to have power to act for the corporation, the words of the charter being regarded as imperative and not mandatory. See *In re Alma Spinning Co., L. R.* 16 *Ch. Div.* 681, 7 *Eng. Ruling Cases*, 589, *and note.* But that decision, if it be correct, relates to the constitution of the board, not the qualification of its members, and does not apply to the question under consideration here. I am not convinced, though neither counsel tried to so convince me, that the non-residence of all the directors of a corporation invalidated their acts as such.

My conclusion on this branch of the case, then, is that the meeting of directors of January 21, 1914, was validly held, and that the persons who participated therein constituted the *de jure* board of directors of the Kehoe Stenograph Company, none of the objections thereto being sustained, but, as appears hereinabove, disapproved.

It is not necessary to consider the proceedings of the special meeting of the stockholders, according to the minutes of the organization by which Dunlap was elected president, held February 3, 1914, for nothing there transpired which had a bearing on whether the board by which Dunlap was so elected president of the company was the *de jure* board, and this is also true of the special meetings of stockholders held on June 29, 1914, and July 7, 1914.

At the meeting of this *de jure* board of directors held on July 7, 1914, in Wilmington, at the office of the company, five of the six directors, viz: all but Kehoe, were present, including Ackerman, and all having been duly notified. Ackerman protested and withdrew from the meeting. The minutes of all prior meetings of stockholders and directors, including the

meeting of January 21, 1914, were read and approved, and all actions therein set forth were ratified and confirmed, as also was the election of officers held at the meeting on January 21, 1914. The board approved of the notice given to Ackerman to pay the amount of his subscription to three shares of stock assessed upon all shares not fully paid the par value thereof; and approved of R. Y. Slater's expenditures of the money which on January 21, 1914, he had reported as having received from Kehoe, Dunlap, Biedler and Waples in payment in full for their shares, as well as his own subscription for four shares. A resolution was adopted directing the officers to take action to enforce immediate payment by Ackerman of his subscription, and in default of such payment to sell pursuant to law the three shares subscribed for by him. Pursuant to this authority advertisement was made of the offer for sale of the three shares of stock, subscribed for by Ackerman, and notwithstanding the injunctive order of the court issued in this case on the filing of the bill, those in charge thereof proceeded having had, as it appeared, no notice of the order of the court, and for default of bidders the stock was forfeited. It was not contended that the action in offering for sale and forfeiting the shares of stock subscribed for by Ackerman was invalid if the board of directors which authorized the *de jure* board, for it was not claimed that the shares had been paid for by any one.

On June 15, 1914, Ackerman assigned to the complainant, Lippman, the three shares of stock subscribed for by Ackerman, but it is expressly conceded that Lippman took the transfer of shares from Ackerman with full notice of all the facts, and so is not entitled to restrain the sale or forfeiture of the shares if Ackerman could not.

The conclusion is, then, that the board of directors which authorized the sale and forfeiture of the stock in question was the *de jure* board and, therefore, had power to sell and forfeit the shares.

Numerous comments have been made on and criticisms of the minutes and proceedings of the company represented by Mr. Dunlap as president, and they have all been con-

sidered with care. But without particularizing them, it has been found that none of them impugn the right of the company to sell or forfeit the shares of the complainant in the manner and for the purpose for which they were forfeited, and it would unnecessarily lengthen this opinion to enlarge upon them.

Several important questions were raised and argued which it is not necessary to decide. Objection to the use by the defendant of its records, minutes and the like as evidence against the complainant was vigorously argued by the solicitor for the complainant, because the company could not make evidence in its own behalf, and was not within the common law and statutory exception respecting books of account of a merchant. But it is unnecessary to decide the question, because the facts contained in the records, etc., were proved by witnesses independent of the records.

Inasmuch as the board of which Mr. Dunlap was the president was the *de jure* board, and had authority to sell or forfeit the shares of the complainant for non-payment of the par value of his shares, it is not necessary to decide the very interesting question which was argued fully on both sides whether a shareholder may, in a proceeding to enforce payment of his subscription to stock, contest the legal standing of the board of directors which called for the payment and was seeking to enforce the payment.

Inasmuch as the sale and forfeiture of the shares was not invalid, the complainant is not entitled to have the transfer thereof enjoined, or to any other relief, and the bill must be dismissed with costs on the complainant.

Let a decree be entered accordingly.

NOTE. The decree entered in this case was affirmed by the Supreme Court. See *post p*. 412.