BELLE ISLE CORPORATION, a Delaware corporation,

*vs.*

T. LEONARD MACBEAN, E. JANE MACBEAN and OAKDALE CONTRACTING COMPANY, INC., a New York corporation.

*New Castle, October 6, 1948.*

*Leonard G. Hagner,* (Clinton DeWitt VanSiclen, of New York City, of counsel), for plaintiff.

*Stewart Lynch,* of the firm of Lynch & Herrmann, (Daniel L. Herrmann and Florence E. Freeman, of the firm of Lynch & Herrmann, and Ira Koenig [of the firm of Bacal & Koenig], of New York City, of counsel), for defendants.

SEITZ, Vice-Chancellor: This is another decision in the running battle taking place between two factions which, as is so often the case, now find it worth their while to have control of plaintiff corporation. Here they literally struck oil.

This is a complaint to cancel certain stock issued to the defendant MacBean, to his wife and to the MacBean-dominated Oakdale Contracting Company, Inc. Three separate transactions are under attack and the factual picture developed at the final hearing differs somewhat from the picture presented at the hearing on the preliminary injunction. See *Belle Isle Corporation v. T. Leonard MacBean, et al.*, 29 *Del.Ch.* 261, 49 *A.* 2*d* 5.

The first transaction involves the issuance of 66,259 shares of the common stock of Belle Isle to the defendant Oakdale Contracting Company, Inc. (hereinafter called "Oakdale"), on April 24, 1940. This transaction was purportedly ratified by the board of directors at their meeting of June 22, 1940. Plaintiff contends that there was no quorum present at the directors' meeting which purported to ratify the transaction and that the stock was issued for inadequate consideration. Oakdale challenges both contentions.

Was there a quorum present at the directors' meeting of June 22, 1940, when this transaction was ratified? As of June 22, 1940, the corporate bylaws admittedly provided for ten directors, and they also provided that a majority constituted a quorum. Up to that time seven directors had been elected and no one had ever been elected to the other three directorships. The reason for the existence of the unfilled directorships is not now important.

At the directors' meeting of June 22, 1940, Milton K. Huppuch was purportedly elected a director. Plaintiff contends that he was elected to fill one of the three directorships never theretofore filled. Oakdale contends that he was elected pursuant to agreement to succeed his father, W. A. Huppuch, Sr., who was then a director. However, Oakdale says that even if he was elected to fill one of the three previously unfilled directorships, such action was a nullity under the Delaware Corporation Law.

The oral testimony as to whether or not Milton K.

Huppuch was succeeding his father as a director is in sharp conflict. Under the circumstances of this case, I prefer to rely on documents prepared by the defendant MacBean, or statements admittedly made by him, since he was in practical control of Oakdale. The minutes of the directors' meeting of June 22, 1940, were prepared by MacBean and signed by a Mr. Corcoran, who was clearly a MacBean representative on the board. These minutes state that Mr. Milton K. Huppuch was elected a director to fill "one of the existing vacancies in the Board". The use of the plural "vacancies" clearly indicates that reference was being made to the three unfilled directorships. It is conceded that Mr. Huppuch, Sr., had not resigned up to this time and the minutes show that he actively participated in the business of the meeting after the election of Milton K. Huppuch as a director. Moreover, the undisputed statement made by the defendant MacBean at a directors' meeting held on October 15, 1946, indicates that even up to that time he was not contending that there was an agreement whereby Milton K. Huppuch was elected a director in 1940 to succeed W. A. Huppuch, Sr. Thus MacBean said at the October 15, 1946 meeting "we are entitled to elect a director to fill a vacancy which has existed for some time, namely, the vacancy created by the death of Winfield A. Huppuch, no director having ever been elected to succeed him and fill that vacancy."

I conclude that the directors at their meeting of June 22, 1940, purported to elect Milton K. Huppuch to fill one of the three previously unfilled directorships and not to succeed W. A. Huppuch, Sr. Did the directors have the power to take such action?

This court has concluded on several occasions that newly created directorships do not create vacancies as that term is used in *Section* 30 of the *General Corporation Law, Rev. Code* 1935, § 2062. *Johnston v. Automatic Steel Products, ante p.* 324, 60 A.2d 455. This court has also recently held that the stockholders may not delegate to the directors by way of a bylaw provision the right to vote for the election

of directors to fill newly created directorships. *Johnston v. Automatic Steel Products, supra.* Since the three directorships mentioned had never been filled, it follows under the Delaware decisions that they were not "vacancies", and the directors could not therefore legally elect Milton K. Huppuch to fill one of these positions. This is so because the bylaw provision purporting to authorize them so to do is invalid under the *Automatic Steel Products* case. The fact that such authority also appeared in the certificate of incorporation does not alter the result. Consequently, Milton K. Huppuch was not legally elected a director at the meeting of June 22, 1940.

We thus proceed on the premise that on June 22, 1940 there were only seven directors, and there were no vacancies as that term is used in *Section* 30. It was held in *Bruch v. National Guarantee Credit Corp.*, 13 *Del.Ch.* 180, 184, 116 *A.* 738, 740, that

"The rule is that the number necessary to constitute a quorum, under a by-law such as appears in this case, is a majority of the entire board notwithstanding there may be vacancies in the board at the time."

Since "vacancies" as used by the court in the *Bruch* case did not include newly created directorships, we must determine whether the newly created but unfilled directorships are included for quorum purposes.

*Section* 9 of the *General Corporation Law, Rev.Code* 1935, § 2041, provides in part that

"The Directors shall hold office until their successors are respectively elected and qualified, and a majority of them shall constitute a quorum for the transaction of business, unless the by-laws shall provide that a different number shall constitute a quorum * * *."

The present bylaw provides that "A majority of the directors shall constitute a quorum for the transaction of business." Thus, the bylaw appears to follow the statute. The quoted language of *Section* 9 says that the directors shall hold office until their successors are elected and qualified. This language can only refer to directorships which

have been filled at some time. It goes on to say in the same sentence that a majority of them—referring to a majority of the directorships which have been filled at some time—shall constitute a quorum for the transaction of business unless the bylaws provide for a different number. However, it is clear that the right to enact a bylaw providing for a different number for quorum purposes refers to directorships which have been occupied at some time and does not encompass newly created directorships.

I, therefore, conclude that the newly created directorships could not be counted under *Section* 9 of the *General Corporation Law* and the existing bylaw in determining the number necessary to constitute a quorum of the board of directors of the plaintiff corporation on June 22, 1940.

In view of my conclusions, it appears that four directors constituted a quorum at the directors' meeting of June 22, 1940. There were admittedly six of the seven directors present. But the plaintiff says that MacBean being interested in the transaction could not be counted for quorum purposes. It also says that Corcoran, being dominated by MacBean, may not be counted. Assuming, but by no means deciding, that both contentions are legally and factually sound, nevertheless, there were still four disinterested directors present and they constituted a quorum for purposes of considering this transaction.

I now consider whether Belle Isle received legally sufficient consideration for the stock. The minutes of the meeting of June 22, 1940 indicate that 41,834[1] shares of treasury stock and 24,425 shares of unissued stock were sold to the defendant Oakdale in exchange for five mortgage notes of the corporation aggregating $10,000. Plaintiff contends that the stock sold was worth at least twenty cents a share (being its par value) which would have made the stock worth $13,251.80. The corporate records indicate that the

---

[1] The stock ledger shows that 39,200 shares were transferred by the corporation and 2,634 shares by MacBean, trustee.

unissued stock involved in this transaction (24,425) was issued at par value and that the balance (41,834), being treasury stock, was issued at twelve cents per share. Since the unissued stock was issued for par and since plaintiff concedes that such was the limit of its value, we need only consider whether the directors were entitled to issue the treasury stock for less than par. I think it clear that the board of directors are not required under all circumstances to sell treasury stock for at least its par value. See *Otter v. Brevoort Petroleum Company,* 50 *Barb.* (*N.Y.*) 247; *Furlong v. Johnston,* 209 *App. Div.* 198, 204 *N.Y.S.* 710, affirmed 239 *N.Y.* 141, 145 *N.E.* 910; 85 *University of Pennsylvania Law Review,* 622. The Delaware cases stating that par value stock may not be issued for less than par refer to its original issuance, e. g., *Yasik v. Wachtel,* 25 *Del.Ch.* 247, 17 *A.2d* 309.

Here the facts indicate a corporation in such a financial state and the selling price of its stock so low that I believe it would be an unwarranted interference with the fair exercise of the business judgment of the directors for this court to say that the value received for the treasury stock was so inadequate as to be legally objectionable. It is not suggested that the treasury stock was not originally issued for the equivalent of its full par value. I conclude that plaintiff corporation has failed to sustain the legal burden of showing "actual fraud" in this transaction.

The plaintiff corporation makes several other contentions. It is contended that the subject matter of the stock ratification was not included in the notice of the meeting, thus rendering the action taken thereon invalid. It also urges that no resolution was adopted ratifying the issuance of the stock, and that the shares were issued as a part of MacBean's scheme to defraud the stockholders. I find no merit in any of these contentions.

It follows from my conclusions that the 66,259 shares issued to Oakdale will not be cancelled.

The second transaction under attack involves the issuance of 25,000 shares of plaintiff's stock to Oakdale on June 25, 1940, pursuant to a resolution passed by the board of directors at the meeting of June 22, 1940. Plaintiff contends once again that there was no quorum present at the directors' meeting of June 22, 1940, and further that the shares were issued without consideration.

I have already concluded that a quorum was present at the directors' meeting of June 22, 1940, for the purpose of considering the first transaction. I find that the same conclusion applies to the second transaction concerning the issuance of the 25,000 shares.

Let us see if the 25,000 shares were issued without consideration. The minutes of the directors' meeting of June 22, 1940 recite "that it had also been agreed (apparently by all the directors) to issue to the said Oakdale Company an additional 25,000 shares out of the remaining unissued 100,000 shares of this Corporation, in consideration of the aid and assistance which that Company had given in bringing about the settlement with the Gonsoulin Heirs." Thereafter, in the minutes there appears a resolution which reads in part that "the President is further authorized to issue and deliver to the said Oakdale Company 25,000 additional shares of the unissued stock of this Corporation" subject to an understanding not now important.

Plaintiff contends that no substantial services were performed by the defendant Oakdale in connection with the Gonsoulin litigation, while Oakdale vehemently denies that such is the fact. Let us see what was done by or on behalf of Oakdale in connection with this matter.

The evidence shows that Oakdale's services were largely rendered in New York and consisted mostly of supplying necessary stenographic facilities. The evidence shows, however, that MacBean, who controlled Oakdale, made a trip to Louisiana and investigated the record land holdings of Belle Isle. He also took an active part looking toward

consummation of some satisfactory settlement. While it might be said that MacBean as president of Belle Isle was under a duty to perform these services for Belle Isle, nevertheless, he did use the facilities of Oakdale in collating the material gathered. The unfortunate financial condition of the Belle Isle Company obviously had an adverse effect on the value of its stock. The 25,000 shares here involved had a par value of only $5,000. The first paragraph of *Section 14* of the *General Corporation Law of Delaware, Rev.Code 1935,* § 2046, provides:

"Subscriptions to, or the purchase price of, the capital stock of any corporation organized or to be organized under any law of this State may be paid for, wholly or partly, by cash, by labor done, by personal property, or by real property or leases thereof; and the stock so issued shall be declared and taken to be full paid stock and not liable to any further call, nor shall the holder thereof be liable for any further payments under the provisions of this Chapter. And in the absence of actual fraud in the transaction, the judgment of the directors, as to the value of such labor, property, real estate or leases thereof, shall be conclusive."

Under this section, which insofar as pertinent was in effect when the 25,000 shares were issued, one attacking the issuance of stock must show actual fraud on the part of the directors in evaluating the labor done by Oakdale for which the shares were issued. The evidence before me does not justify any finding of actual fraud in issuing these shares. I do not believe this court could properly conclude that the services rendered by Oakdale for which it received stock probably worth no more than $2,500 were so inadequate as to justify the conclusion that the directors were guilty of actual fraud in evaluating it. A majority of the board having no connection with Oakdale and representing a large amount of the stock were present at the meeting and voted to issue the shares to Oakdale. All of these directors were well aware of MacBean's connection with Oakdale.

I conclude that the 25,000 shares issued to Oakdale may not be cancelled.

We come now to the third and last transaction here under attack.

At a directors' meeting held on June 3, 1944, a resolution was purportedly passed directing the issuance of 75,000 shares of the twenty cent par value common stock to Mac-Bean for services rendered by him to the corporation from 1928 to December 31, 1938. On June 5, the corporation issued the 75,000 shares (55,000 to MacBean and 20,000 to his wife). Plaintiff contends that no quorum was present at the meeting authorizing the issuance of these shares. It also contends that MacBean gave no consideration to the corporation for such shares and that, in any event, he agreed to render any such services without compensation in return for certain stock assigned him by W. A. Huppuch, Sr. Finally, it is argued that MacBean fraudulently concealed the fact that the striking of oil was imminent. Mac-Beans contends that a quorum was present and that the shares were issued in payment of services rendered by him to the corporation from 1928 to December 31, 1938. He denies that he agreed to serve without compensation, and he denies that he caused the directors to issue the shares at a time when he fraudulently concealed from them the fact of the imminence of striking oil.

At the directors' meeting of June 3, 1944, there were four purported directors present, namely, MacBean, Irish, Milton K. Huppuch and Corcoran. In the interval between the meeting of June 22, 1940, and the meeting of June 3, 1944, no stockholders' or directors' meetings had been held. The bylaws were of course unchanged. Consequently, it follows that Milton K. Huppuch had never been legally elected a director and, therefore, could not be counted for the purpose of determining the existence of a quorum at the June 3 meeting. Thus, without consideration of the other arguments advanced by plaintiff, it appears that there was no legal quorum present at the meeting of June 3, 1944. This defect was not remedied by the purported ratification of the minutes of this meeting at the directors' meeting of

March 28, 1945, because, aside from other reasons, there was no quorum present at that meeting at the time the purported ratification took place. Other contentions as to the invalidity of the meeting need not be considered.

Consequently, I conclude that the resolution purportedly passed at the meeting authorizing the issuance of the 75,000 shares to MacBean is not to be approached and tested by the rule that the determination of the directors is conclusive in the absence of actual fraud. This follows from the fact that there was no "legal" director action which can be relied upon by the defendant MacBean. However, the stock was issued, and I believe that the equities require that I determine whether substantial consideration was actually given by MacBean for the shares. I say this because in my opinion this stock should not be cancelled unless it is demonstrated that no substantial consideration was received by the corporation. See 11 *Fletcher Cyc. of Corp.*, (*Perm. Ed.*) § 5166. Since stock issued without consideration is voidable and not void in this state, *Finch v. Warrior Cement Corporation*, 16 *Del.Ch.* 44, 141 *A.* 54, I see no reason why the same rule should not apply to stock which could have been legally issued, but was not so issued only because of a lack of a quorum (assuming valid consideration).

Plaintiff contends that prior to the incorporation of Belle Isle the defendant MacBean agreed with one Winfield A. Huppuch that he would take over as general manager of the corporation and serve without compensation until the corporation's income permitted payment therefor. In return for this promise Mr. Huppuch transferred to him one-half of his stock interest in two then existing corporations known as Premier Oil and Sulphur Company and Republic Oil and Sulphur Company (hereinafter called "Premier" and "Republic"). MacBean concedes that he received the said stock interest from Huppuch. He contends, however, that the agreement only referred to his initial work in connection with the organization of Belle Isle. He contends that as to his services as general manager, he was

to be paid when the corporation became economically self-sufficient and that the 75,000 shares constitute such payment for the first ten years of such services.

To resolve the problem of ascertaining the terms of the oral agreement admittedly made between Huppuch and MacBean, it becomes necessary to state generally the situation which existed in the year 1928 prior to the incorporation of Belle Isle. For a good many years prior to 1928, Premier and Republic owned land in Louisiana which was thought to be potentially valuable for salt, sulphur and oil. However, the land had never been developed. The great bulk of the stock ownership of these corporations was apparently held by five men, namely, Winfield A. Huppuch, Sr., Gustavus A. Rogers, Roderick Begg, Edward F. Irish and George Burnham. Upon the death of George Burnham, who was related to MacBean through marriage, MacBean became interested in the Republic and Premier stock through investigating it for the executor. Later he purchased the stock of Premier and Republic owned by the estate. It was at this time that he became acquainted with the other large stockholders of these corporations.

When MacBean told Huppuch that he intended to buy the Burnham interest in Premier and Republic, Huppuch offered to turn over one-half of his stock in these corporations in return for MacBean taking over as general manager of a corporation which would develop the Premier and Republic land. Shortly thereafter Belle Isle was formed and took leases on the Premier and Republic land in return for the issuance of stock to a syndicate consisting of Huppuch, MacBean, Begg and Rogers (Irish entered later).

We come now to the question of the terms of the agreement whereby Huppuch turned over one-half of his stock interest in Premier and Republic to MacBean and MacBean became general manager of the subsequently formed Belle Isle Corporation. Incidentally, Huppuch's interest in those corporations was admittedly substantial and he is now de-

ceased. Looking to the correspondence which was introduced into evidence we find the following letters throw some light on the terms of the agreement. On April 1, 1929, which was after the formation of the Belle Isle Corporation and after MacBean became its general manager, the defendant MacBean wrote a letter to Mr. Huppuch, Sr., which insofar as pertinent reads:

"As you will remember, when you first broached the question of my coming into the Belle Isle proposition and taking over the management of the property down there, you agreed that if I would do so you would turn over to me one-half of the stock interest you then had in each of these companies, which offer I later accepted and we have gone ahead with what might be called the reorganization for the purpose of handling this property.

"In order, therefore, to put me in a position where I can properly protect my interests and also be in a position to answer the various criticisms which will from time to time be made in respect to my handling of this proposition, I should like very much if you would take whatever steps may be necessary to transfer 50% of your interest in these companies to my name."

In accordance with MacBean's request, Huppuch caused one-half of his stock in Premier and Republic to be transferred to MacBean. This is conceded. Thereafter, by letter dated August 8, 1929, MacBean wrote to Huppuch in part:

"* * * My understanding with you in respect to the handling of these properties [property leased to Belle Isle] was that I would have the right to name my own Directors and my own Officers, which I did * * *.

        *    *    *    *    *    *

"I am having difficulties enough in trying to work out the best way of handling a rather involved proposition and I must insist upon being allowed to handle it in my own way."

On December 2, 1930, Huppuch wrote to MacBean in part as follows:

"Now as to your statement that the Belle Isle Corporation will have to raise some money somehow or somewhere, to take care of the personal demands such as those you refer to. I am frank to say that I have no suggestion to offer at this time. Candidly, I feel that

I have done my full share for the present, in fact, more than I really had agreed to do, when I entered into the arrangement with you, as to turning over a part of my holdings with the understanding that you would arrange to finance and take personal charge of the future developments of the property.

"Now frankly, MacBean, don't you think that I have?"

And on January 5, 1933, Huppuch again wrote to Mac-Bean and said in part:

"Now, in all frankness, MacBean, my position is different from that of Rogers and Begg. I contributed one-half of my stock to you with the understanding that you would finance and manage the Company and, which agreement I carried out. I did say that I would do all I could to help you finance from time to time, although I stated no definite amount, and I really feel that I have done my share, which you have indicated in your letters from time to time."

By letter dated January 20, 1933, MacBean replied to Huppuch's letter of January 5 and stated insofar as pertinent:

"My understanding of the agreement under which you turned over one half of your stock to me does not coincide with that expressed in the third paragraph of your letter as I never at any time agreed to finance the company, although I have done everything I could at all times to help in its financing and you have too. This question about our understanding or agreement was raised in your letter to me of December 2, 1930 and shortly thereafter I took it up with you personally at the Commodore at which time I stated to you what my understanding of the arrangement had been and showed you a copy of my letter to you under date of April 1, 1929 and after discussing the matter further you agreed with me that I had not agreed to finance the company.

"In order to refresh both of our minds at this time it seems advisable to set forth my understanding of our agreement and the general details of the circumstances surrounding its making.

"In our room at the Hotel St. Charles in New Orleans after our return from Belle Isle, Mr. Begg remarked that he wished I was associated with you in the development of the various properties and you stated that I was going to be because you were going to make me a proposition before we got back to New York, that I could not refuse. On the train coming back to New York you repeated that statement and then said that if I would come into the company and take over its management you would turn over to me one half of your stock in

both the Premier and Republic Companies. After some discussion I stated that it would not interest me unless sufficient capital was assured to develop the properties and in answer to your inquiry I expressed the opinion that a minimum of $300,000.00 would be required which you agreed could be raised after which I agreed to think your offer over and let you know my decision. Some time later I accepted your offer and the Belle Isle Corporation was formed from which time on you are familiar with everything that has happened, in connection with the company.

"As a matter of fact Mr. Huppuch I certainly would not have been interested in your offer at all had I known or even thought I was going to be expected to finance the company and frankly I don't think you really meant it when you stated in your letter:

" 'I contributed one half of my stock to you with the understanding that you would finance and manage the Company.'

"If my understanding of our agreement as above set forth is not in accord with yours I wish you would let me know for then there must be something wrong somewhere and the quicker we get it straightened out the better it will be for the both of us as I for one do not like to have any disagreement in matters of this kind."

I believe a reading of the quoted material, coupled with an understanding of the background of the situation, indicates that Huppuch and MacBean agreed that MacBean would take over and manage Belle Isle exclusively in return for one-half of Huppuch's stock interest in Premier and Republic. The tenor of the letters indicates that MacBean's obligation was to be a continuing one, and I think it implicit in the correspondence that MacBean's services were to continue under the agreement until the corporation's property produced revenue sufficient to permit the payment of a salary to MacBean. MacBean testified that he was to be paid, but that payment for his services would come out of the production of "a revenue which would permit their paying me a salary". As I read the pertinent letters, and consider the evidence, I believe that MacBean's services were to be without charge to the corporation until the venture produced revenue of a substantial amount. The nature of the property and the manner in which it was managed demonstrate to me that the parties were embarking on a gamble

that some day the land could be profitably exploited and that MacBean was serving with that in mind. It is conceded that the property was not profitably exploited in any real sense from 1928 to 1938.

The correspondence between MacBean and Rogers indicates to me that MacBean assumed that he was serving without compensation, which is consistent with the existence of the Huppuch-MacBean agreement on the terms found. Thus, by letter of February 25, 1929, Rogers sent MacBean a bill for legal services to Belle Isle in connection with its incorporation, and he also stated in the letter that "Later we will compile and send our bill in the matter of the lease with the Freeport Company * * *." The lease with the Freeport Company was made several months after the incorporation of Belle Isle and after MacBean took over as general manager. By letter of July 12, 1929, MacBean wrote Rogers protesting against the bill which was termed as excessive. In the same letter he said:

"It was my understanding at the time that we made arrangements to organize Belle Oil Corporation, that each of us were to render what service we could for the benefit of said Corporation free of charge and my recollection is that you yourself made a statement to that effect at the time we had our meeting at the Commodore Hotel, and I personally feel that in view of your connection with this Corporation and the expressions voiced at the various meetings which we had preliminary to the final completion of the organization of this Corporation, that your fee of $750.00 should be withdrawn or that it should be reduced by at least $500.00.

"Of course I realize that you yourself did not attend to all of the details connected with the organization of this Corporation, but that you did use the services of certain of your employees or associates in connection therewith, but that has also been my experience in that I have devoted considerable time to the interest of this Corporation and also have taken advantage of the services of various employees of my organization to further the interests of this Company, and I think it has also been the experience of certain others of our associates."

By letter dated August 20, 1929, Rogers wrote Mac-Bean that any fee for services rendered on the Freeport

lease was waived, and only actual disbursements were requested.

I infer from this correspondence that MacBean had agreed to serve without compensation other than the receipt of the Premier and Republic stock. The other large stockholders had apparently agreed to forego compensation, but not on the basis of the receipt of any stock interest. It is not unusual that MacBean should agree to serve as general manager without compensation until the corporation produced income of substance in view of the somewhat limited amount of time which he could expend on this work (as then viewed), his other interests, and the fact that he had also purchased the Burnham stock interest in Premier and Republic. Thus, he was such a substantial stockholder in Belle Isle by virtue of his holdings in Premier and Republic (translated into Belle Isle stock) plus his acquisition of Belle Isle stock as a member of the syndicate which arranged the leases with Republic and Premier, that he had an incentive to make the corporation a financial success aside from any question of salary payments. The evidence demonstrates that MacBean considered the Premier and Republic stock and its Belle Isle equivalent to be of real value about the time he acquired it.

MacBean's testimony that Huppuch made a "gift" of the Premier and Republic stock to him purportedly to keep him interested in Belle Isle is difficult to reconcile with the use of the term "agreement" by Huppuch and MacBean in their correspondence. Incidentally, prior to this time Huppuch and MacBean were strangers to one another.

The corporate records show that MacBean was reimbursed in substantial amounts for actual expenses incurred during the period between 1928 and 1938, but that no salary was accrued. Moreover, the issuance of the 66,259 and the 25,000 shares of stock to Oakdale in 1940, realistically viewed, constituted payment to MacBean for many of his services. The fact that the stock payments were made to Oak-

dale for work done almost entirely by MacBean are also some evidence that MacBean was not to be compensated for past services rendered as general manager of Belle Isle.

No mention of a salary appears in any minutes of the directors' or stockholders' meetings until the meeting of June 3, 1944, when the resolution purportedly authorizing the issuance of 75,000 shares was passed. MacBean says it was mentioned at the meeting of June 22, 1940, but the minutes of that meeting, which were prepared by MacBean, fail to mention it, and yet the tenor of the minutes generally indicate that MacBean often inserted in the minutes mention of things less important. Moreover, W. A. Huppuch, Sr., the other party to the agreement, as well as Rogers and Begg were alive and present at the 1940 meeting. By the time of the 1944 meeting they were all dead. This combination of circumstances tends to impair substantially the weight which might otherwise be given to these alleged corporate minutes.

In arriving at my conclusion as to the existence and terms of the agreement between Huppuch and MacBean, I have necessarily rejected certain oral testimony. However, I feel that the documentary evidence plus the surrounding circumstances I have mentioned are entitled to a preference in resolving the present dispute.

Can the plaintiff corporation now take advantage of this pre-incorporation agreement between Huppuch and MacBean to the extent that it may successfully urge that MacBean was not entitled to be paid by the corporation for his services between 1928 and 1938 because he had been compensated therefor under the Huppuch-MacBean agreement? I think it clear that Belle Isle accepted and operated under the agreement. MacBean, of course, was president of Belle Isle during the entire period involved. I believe the agreement made the Belle Isle Corporation when it was formed a third party donee beneficiary and that as such it was and is entitled to the benefit of the agreement. I

further believe it may secure that benefit by showing that MacBean was not entitled to the 75,000 shares of stock for services because he had already been fully paid therefor. In reaching this conclusion, I assume rather than decide, that MacBean performed services for this period for which he would otherwise have been entitled to compensation equivalent to the value of 75,000 shares when issued to him.

The 75,000 shares should be cancelled. Since certificates representing 75,000 shares were deposited with the Register of this court as ordered in the preliminary injunction (29 *Del. Ch.* 261), these certificates should be turned over to the corporation for cancellation, and an appropriate indication that the shares are not outstanding should be made on the corporate books.

An order accordingly will be advised on notice.