Botsford, J.
This action concerns 250,000 shares of common stock in the plaintiff company, BioTrack, Inc. (BioTrack). BioTrack asserts that the shares in question currently belong to it as treasury stock, the defendant Indu Muni (Muni) having forfeited his right to them by failing to pay the subscription price. Muni contends the shares are rightfully his. BioTrack brings claims for declaratory and injunctive relief, replevin, breach of contract and conversion, and seeks to compel return of the stock certificate for the 250,000 shares which were issued to Muni. Muni brings counterclaims alleging conversion, breach of fiduciary duty, and deceit.
The case was tried before me without a jury in December 1999. Set forth below are my findings of fact and a discussion of the legal claims and issues raised. *245 For the reasons stated there, I conclude that BioTrack is entitled to a return of the stock certificate, and Muni’s counterclaims should be dismissed.
FINDINGS OF FACT
BioTrack is a medical device company in the business of developing tumor tracing technology for improving, inter alia, breast biopsy procedures. BioTrack was formed in 1997 as a subsidiary of DynaGen, Inc. (DynaGen), a publicly traded company in the medical and pharmaceutical business. DynaGen was established in 1988 by Muni and Dhananjay G. Wadekar (Wadekar).
In 1996, before BioTrack as a corporation was on the horizon, DynaGen acquired the exclusive, worldwide rights to a new technology for tracing and locating tumors in the breast, and by early 1997, DynaGen was beginning to fund the further development of that technology. With the financial assistance of DynaGen, the scientists who had invented the technology were working on developing software and Wadekar in particular worked with these scientists on patent applications. Muni also worked with the inventors on these matters. Both Wadekar and Muni performed this work in their capacities as officers and employees of DynaGen, since the technology was a corporate opportunity of DynaGen’s. At all relevant times until November 5, 1998, Muni was president and chief executive officer of DynaGen; there is no dispute that he was fully compensated for his services performed for DynaGen. At all relevant times, Wadekar was and remains DynaGen’s executive vice president.
By the summer of 1997, DynaGen’s financial condition was becoming precarious at best, for reasons unrelated to the tumor tracing technology. DynaGen decided to form a separate company to develop that technology, and did so in July of 1997; the separate company was the corporation now known as BioTrack. It was organized as a Delaware corporation on July 23, 1997, and originally had the name of DynaGen of Massachusetts, Inc. Muni was its president, and Wadekar was the vice president; the two were also the only directors.[1]
BioTrack began its existence as a wholly owned subsidiary of DynaGen. BioTrack occupied the same offices as DynaGen and it had the same officers, viz., Muni and Wadekar. As a practical matter, BioTrack at the outset was a part of DynaGen with little separate existence except on paper.
By early 1998, DynaGen’s financial troubles were making it impossible for DynaGen to raise money for BioTrack. Accordingly, the suggestion was made for DynaGen to reduce its equity interest in BioTrack, so that BioTrack might independently seek the funding it needed to move forward.
On April 29, 1998, there was a meeting of the BioTrack board of directors. The purpose of the April 29 meeting was to finalize a plan for the reduction of DynaGen’s ownership interest in BioTrack and for the future structure of BioTrack. Present were the directors, Wadekar and Muni, and two other men very involved in BioTrack’s operations, Thomas O’Brien (O’Brien) and Steven Georgiev (Georgiev). For the two months preceding the April 29 meeting, in March and April of 1998, O’Brien has been working as a consultant to BioTrack, and specifically was engaged in evaluating the tumor tracing technology from a business standpoint and the potential market for such a technology. Georgiev at that time was a member of the board of DynaGen. He had known Wadekar for many years, and had a background in business as well as science.- He had served as a business consultant to many companies in the medical technology field. Since the end of 1997, he occupied an office at DynaGen, and was working with Wadekar and O’Brien on the business development of BioTrack’s technology.
Wadekar, Muni, Georgiev and O’Brien agreed at the April 29 meeting that DynaGen would offer or sell 80 percent of its shares in BioTrack back to the company, in exchange for a $1 million promissory note. They further agreed that Muni and Wadekar would resign as BioTrack officers and directors, and Georgiev and O’Brien would be appointed as the new directors; that O’Brien would become the president of BioTrack and its chief executive officer; and that Georgiev would serve as chair of its board of directors. The men also discussed at the meeting the need for the four to work as a team and to keep both DynaGen and BioTrack viable as businesses; with respect to DynaGen, they recognized that if it were to file for bankruptcy in the near future — before twelve months passed following the separation of BioTrack from DynaGen — there was a significant chance that BioTrack would be drawn into (“sucked into,” in Georgiev’s words) the bankruptcy proceedings.
Finally, there was a discussion about offering shares of BioTrack original issue common stock to each of the four men.[2] It was agreed that each be given the opportunity to acquire a designated number of shares: 500,000 shares for Georgiev, 300,000 shares for O’Brien, 250,000 shares for Wadekar and 250,000 shares for Muni. The men also agreed that these shares would be offered to each at the subscription or strike price of $.05 per share.[3] They further discussed that the shares were to serve as an incentive for the four men to continue working for — providing services to — BioTrack and DynaGen in the future. With respect to Georgiev and O’Brien, the shares were offered in recognition that they would be playing a critical future role in the structuring and operation, respectively, of BioTrack; in the case of Wadekar and Muni, there was an understanding that the offering of stock to each was conditioned on his remaining actively engaged in work for DynaGen for at least six months.
How the four men would pay for the shares also came up as a topic at the meeting. As of the end of *246 April 1998, three of the four men (all but Muni) were creditors of BioTrack: Wadekar had loaned the company approximately $53,000 between October 1997 and February 1998, and the loan(s) remained unpaid; Georgiev had loaned BioTrack something in the vicinity of $35,000 which had not been repaid to him; and O’Brien was owed $20,000 for the consulting work he had performed in March and April 1998.[4] The men reached an understanding that Wadekar, Georgiev and O’Brien would each pay for their shares of stock by partially forgiving BioTrack’s debt in the appropriate amount ($12,500, $25,000, and $15,000, respectively), and Muni, who was not a creditor of BioTrack, would have six months in which to come up with the money ($12,500) to pay for his shares.[5]
On April 30, 1998, the day after the BioTrack directors’ meeting, there was a meeting of the DynaGen directors. Muni, Wadekar and Georgiev were present, as well as David Broadwin, an attorney who served as DynaGen’s outside counsel and secretary. At some point either before the meeting or during a break in it, Muni, Wadekar and Georgiev were together, without Broadwin. The three went over the terms they had agreed to the previous day concerning the issuance of BioTrack stock to each of them, including the conditions that in order to acquire the stock, Muni would be required to pay the $12,500 owing (250,000 shares x $.05 per share) within six months. Muni did not express any disagreement with these terms.[6]
A month later, on May 29, 1998, another meeting of BioTrack’s board of directors was held. By that time, BioTrack had retained Broadwin, DynaGen’s outside counsel, to perform the same function for BioTrack. One of the purposes of the May 29 meeting was to acquaint Broadwin with BioTrack and its corporate operations. Accordingly, Broadwin was present, along with Wadekar, Muni, Georgiev, and O’Brien. These four discussed the offering of BioTrack original issue stock to themselves as the principals in the management of BioTrack and DynaGen. The stock offering was presented to Broadwin as a decision made or an action taken at the earlier meeting of April 29. The discussion on May 29 included the information about how many shares each of the four men would receive, and the terms of the stock offering, including the term that payment for the shares needed to be completed within six months, and if it were not, the shares would be forfeited. Neither Muni nor anyone else present at the May 29 meeting voiced any objection to these terms.[7]
At the beginning of July 1998, Broadwin prepared a “consent of the board of directors” (consent) for BioTrack which lists the shares of BioTrack common stock sold to various individuals in April and May of 1998, and sets out the directors’ approval of the sales. The shares sold to O’Brien, Georgiev, Wadekar and Muni are included in this list. The consent then states explicitly that ”[u]pon receipt of [BioTrack] from persons above of the full consideration herein above referred to, the officers of the corporation” are individually authorized to execute and deliver the stock certificates. The consent lists the price per share of the stock sold to these four men as $.02, but, as indicated previously, all parties agree that ultimately, the price per share for the stock was $.05. The consent was signed by Georgiev, O’Brien, and Wadekar.[8]
Neeta Wadekar, Wadekar’s wife, was employed part-time by DynaGen as its in-house accountant, and performed accounting services for BioTrack as well. She was also the person charged with (1) holding the stock certificates pertaining to the shares of stock offered to Muni, Wadekar, Georgiev and O’Brien at the April 29, 1998, BioTrack directors’ meeting, and (2) transferring each certificate to its owner when the consideration was paid. Muni asked for his stock certificate several times during the summer of Í998, and at first Neeta Wadekar refused to give it to him because he had not paid for the shares. Ultimately, in or around July of 1998, in response to Muni’s repeated requests, Mrs. Wadekar gave the certificate to him despite his failure to pay the $12,500. She did so primarily because she trusted that he would pay the. money owed; Muni and Wadekar had been working together for a long time, and the relationship, in Neeta Wadekar’s mind, was a close, friendly one.[9]
Muni resigned as president and chief executive officer of DynaGen effective November 5, 1998, six months and one week after he was offered the shares in BioTrack.[10] He took the stock certificate with him, although he still had not paid in any money for the shares in question. When O’Brien, as president of BioTrack, became aware that Muni had not paid for the shares, he caused Neeta Wadekar to make a journal entry in BioTrack’s financial books to reflect that the shares offered to Muni had been cancelled. The journal entry was made in December of 1998.
By letter dated February 1, 1999, O’Brien notified Muni that since his ownership of the 250,000 shares of BioTrack stock was contingent on his paying the strike price of $.05 per share within six months of April 29, 1998, and since he had not paid for the shares, “BioTrack has rescinded its offer ... of 250,000 shares, cancelled the certificates issued ... in April 1998, and returned the shares to the Company treasury.” Muni, through counsel, responded with a letter dated February 9, 1999. The letter stated that the 250,000 shares had been issued to him with no conditions placed on the issuance in terms of time limitations for payment, that he would pay the $12,500 owed within the next six months — i.e., by August 1, 1999— and if BioTrack did not reissue the 250,000 shares to him, he would be forced to bring suit.
BioTrack’s journal entries reflect that in April 1998, adjusting entries were made to offset $12,500 of loans Wadekar had made to BioTrack against the $12,500 *247 owed to the company for the 250,000 shares of common stock which Wadekar was authorized to obtain pursuant to the April 29 BioTrack directors’ meeting. [11] The journal further reflects adjusting entries in December of 1998 which offset Georgiev’s loan to BioTrack to the extent necessary to pay for his 500,000 shares as well as the reduction in the amount owed to O’Brien on account of consulting services performed before April 30, 1998, as payment for his 300,000 shares.
DISCUSSION
Choice of Law
The parties agree that because BioTrack is a Delaware corporation, Delaware law governs questions about the validity of the stock certificate held by Muni, and the 250,000 shares of stock it represents. See G.L.c. 106, §8-110(a)(1), d. They appear to disagree, however, about whether the major question to be decided in this case is a claim about the validity of the stock, or competing claims of right to the stock — an inquiry which presumably accepts the stock as validly issued. See G.L.c. 106, §8-110(c). I agree with Bio-Track that the dispute is properly viewed as one which concerns the validity of the shares issued to Muni. Accordingly, I conclude that Delaware law applies.
2. The Validity of Muni’s Shares.
The Delaware Constitution, Article IX, §3, provides that ”[n]o corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation.” See 8 Del.C. §152.[12] As the facts above indicate, the 250,000 shares of stock which BioTrack was offering to issue to Muni had a price of $.05 per share, to be paid within six months of the agreement to offer them, and Muni did not make any part of the required payment within that time, or indeed at any time to date.[13]
BioTrack argues that in light of these facts, the shares of stock issued to Muni are void and must be cancelled as matter of law. I disagree that the shares are void. Delaware law appears to draw a distinction between a case where the issuance of a company’s stock itself violates a provision of Delaware’s Constitution, its corporation law or the company’s own corporate charter, and one where the company has the power and authority to issue stock but does so without receiving the required consideration. Compare Triplex Shoe Co. v. Rice & Hutchins, Inc., 152 A.2d 342, 347 (Del. 1930); Highlights For Children, Inc. v. Crown, 227 A.2d 118, 121-22 (Del.Ch. 1966); and Scully v. Automobile Fin. Co., 109 A.2d. 49, 50-53 (Del.Ch. 1920), with, e.g., STAAR Surgical Co. v. Waggoner, 588 A.2d 1130, 1133-34 (Del. 1991) (preferred shares issued to defendant were void where corporate board failed to adopt the required resolution for their issuance; because the preferred shares were void, the common shares associated with them were also void). In this case, there is no disagreement that BioTrack (1) had the authority to issue shares of common stock in April 1998; (2) had sufficient authorized but unissued shares to cover those that were issued;[14] and (3) followed the proper corporate procedures to do so. Accordingly, the issuance of 250,000 shares of stock to Muni without receipt of consideration from him makes the shares voidable, but not void. See Scully, supra. See also Belle Isle Corp v. MacBean, 61 A.2d 699, 705 (Del.Ch. 1948). It becomes necessary to consider whether there are equitable reasons to permit Muni to pay the subscription price of $.05 at this point in time and to retain the shares improperly issued to him. See, e.g., McClary v. Pleasant Hills, Inc., 109 A.2d 830, 835 (Del.Ch. 1954).
On the evidence presented here, equity does not favor permitting Muni to pay for the 250,000 shares of stock at this point in time. The agreement made on April 29, 1998, was clear: Muni would be entitled to shares of BioTrack original issue stock on payment of the subscription or strike price, and on two further conditions: that Muni pay for the shares within six months, and that he remain at DynaGen for at least six months following April 1998. These were the same terms that applied to Wadekar, and essentially the same that applied to Georgiev and O’Brien.[15] Each of these three men satisfied the conditions governing the stock issuance, but Muni did not, at least insofar as the financial terms are concerned. While Muni claims he was not aware of the need to pay for the shares within six months, as the facts above indicate, this was an express condition of the stock offering, and Muni was an integral member of the small group who discussed and agreed to it — at the BioTrack directors’ meeting on April 29, 1998, and then again the next day at the DynaGen directors’ meeting — and as previously stated, I do not credit Muni’s stated of lack of awareness. (See p. 5 note 5 above.) Moreover, quite apart from the six months’ limitation, Muni had to have been aware that it was improper for him to be given the stock certificate without paying for the shares. Neeta Wadekar delivered this message to him, but he chose to ignore it and demanded the stock certificate from her in any event. This is not conduct which commends itself to equitable relief, particularly when one factors in that Muni was fully paid in his capacity as an employee of DynaGen for the work he performed on behalf of BioTrack. See, e.g., Belle Isle Corp. v. MacBean, supra, 61 A. 2d at 705. Compare McClary v. Pleasant Hills, Inc., supra, 109 A.2d at 835 (defendants, who had been issued stock shares based on improper consideration consisting of loans to the company and unvalued services to the corporation, would be entitled to elect to retain the shares by paying the original price plus interest, where they had performed substantial uncompensated services to the corporation and had lent it sums of money interest free). Compare also Highlights for Children, Inc. v. Crown, supra, 227 A.2d at 122-23 (denying summary judgment to corporation seeking to cancel shares *248 issued to defendant’s decedent for lack of consideration because facts about the latter’s leaving his law practice to work for the corporation, the corporation’s possible acquiescence in the issuance of the shares to him, and other facts created disputed issues concerning the equities of the situation).
In sum, I conclude that BioTrack is entitled to have the 250,000 shares of stock issued to Muni cancelled because the shares are invalid for lack of consideration.[16] It follows that BioTrack is also entitled to have the stock certificate returned to the corporation.[17] Muni has asserted counterclaims for conversion, breach of fiduciary duty, and deceit.
What he presses is his claim for conversion, and in particular, for a return to him of the shares of stock that BioTrack cancelled. For the reasons stated above, Muni’s claim of conversion must be rejected, as well as his other claims.
ORDER
For the foregoing reasons, it is ordered that a final judgment enter in this case as follows:
On Count I of the complaint, declaring that the 250,000 shares of original issue common stock of BioTrack, Inc., issued to the defendant Indu Muni in 1998, are invalid for lack of consideration, and BioTrack, Inc. is entitled to cancel the issuance of these shares and return the same to the company’s treasury; and that BioTrack, Inc. is further entitled to the return of the stock certificate associated with such shares that was delivered to the defendant Muni in 1998;
On Counts II through V of the complaint, discussing these counts;
On Count VI of the complaint, ordering that the defendant, Indu Muni, return to BioTrack, Inc., through its counsel, the stock certificate described above, on or before June 30, 2000;
On Counts I, II and III of the defendant Muni’s counterclaim, dismissing the counts.

In October of 1997, the name of DynaGen of Massachusetts Inc., was changed to BioTrack.

Stock was also to be offered to the Inventors of the tumor tracing technology.

BioTrack’s common stock had a value of $.01 per share. The men debated whether the strike price should be $.05 per share or $.02; there was some doubt whether the lower price would be acceptable as a reflection of fair market value. It was decided to ask for advice from BioTrack’s outside accountants, and the advice the accountants ultimately provided was that the stock price could not be lower than $.05 per share. The parties in this case agree that the price of the shares in dispute was to be $.05 per share.

Before O’Brien began his work as a consultant for BioTrack, he had reached an understanding with Wadekar that he would be paid $10,000 a month for his services if the money were there to pay him, but without any guarantee that this would be the case. There appears to be no dispute that O’Brien in fact did perform the consulting work he was retained to do in March and April.

Muni testified there was no discussion at the April 29 meeting that Wadekar and Georgiev would pay for their stock through partial forgiveness of their loans to BioTrack or that O’Brien would receive his in exchange for consultant services previously rendered. Rather, according to Muni, the discussion was that each man would receive his shares in partial exchange for services he had previously rendered to BioTrack, that each would also be required to pay $.05 per share, and that there was no time limitation set for making the payment. I do not credit this testimony. Wadekar, Georgiev and O’Brien separately and credibly testified that the April 29 meeting included a discussion that each of them would pay for their shares by partial forgiveness of BioTrack’s financial obligations to them, that Muni would be given six months to pay for his, and that with the exception of O’Brien’s case, there was no mention of each of them being issued shares in partial exchange for past services to BioTrack. Moreover, trial exhibits 8 and 30 make clear that at least insofar as O’Brien is concerned, the plan that he would pay for his 300,000 shares by forgiving $15,000 of the $20,000 owed to him for consulting had been proposed by Georgiev five days before the April 29 meeting, and thus it seems reasonable to assume that it would be discussed at the meeting when the mechanics of paying for the shares came up. In addition, BioTrack’s financial records contain a journal entry pertaining to the stock shares which shows the cost per share for all the shares in question as a receivable, and there is no corresponding journal entry reflecting an expense item related to services previously provided by all the four men — such an entry would be expected if the stock shares were being offered as partial compensation for past services for all of them.
Muni also testified that no one talked about his or Wadekar’s committing to stay with DynaGen for at least six months at the April 29 meeting. Again, I find Wadekar’s contrary testimony more persuasive, and in this regard note that Muni’s chosen date of departure from DynaGen came almost exactly six months (six months and one week) after the April 29 meeting. See p. 8 below.

These findings concerning the April 30 discussion of the BioTrack stock offering are based on the trial testimony of Wadekar and Georgiev. I credit their testimony on the point. Muni did not mention the April 30 DynaGen directors’ meeting in his testimony at all.

Broadwin testified that the discussion just summarized in the text took place at the May 29 meeting; Wadekar, Georgiev and O’Brien testified generally to the same effect although Georgiev did not remember any discussion of forfeiture. As the text implies, I credit Broadwin’s testimony. Broadwin’s contemporaneous notes of the meeting mention forfeiture.

Wadekar should not have signed the consent, because at the time, he was no longer a director of BioTrack. At trial, both Wadekar and Broadwin acknowledged the error. I accept their testimony that Wadekar’s signing the consent was simply a mistake that has no real significance to this case.

Neeta Wadekar testified that she also gave Muni the shares because in effect he was her boss. I do not give much credence to this explanation in light of Neeta Wadekar’s status as the wife of Wadekar, who was himself an officer and director of DynaGen.

Muni had announced that he would be resigning in a letter delivered approximately two weeks earlier.

Wadekar purchased an additional 125,000 shares of BioTrack stock one day later, on April 30, 1998, but this was a separate transaction. Wadekar paid $.20 for each of these shares. It may be that the payment again took the form of loan forgiveness, but this is not a critical point to the present case.

Section 152 provides in relevant part:
*249 The consideration... for subscriptions to, or the purchase of, the capital stock to be issued by a corporation shall be paid in such form and in such manner as the board of directors shall determine . . . The capital stock so issued shall be deemed to be fully paid nonassessable stock, if: (1) The entire amount of such consideration has been received by the corporation in the form of cash, 'services rendered, personal property, real property, leases of real property or a combination thereof, or (2) not less than the amount of the consideration determined to be capital pursuant to §154 of this title has been received by the corporation in such form and the corporation has received a binding obligation of the subscriber or purchaser to pay the balance of the subscription or purchase price; . . .

Under Delaware law, the promise of future services is not valid consideration. See, e.g., Scully v. Automobile Fin. Co., 109 A.2d 49, 50-51 (1920). Future services, however, were not part of the consideration to be given for the shares ofBioTrackat issue. Rather, the agreement was that the stock would be offered to the four men involved as an incentive to continue with DynaGen and BioTrack, provided that the consideration of $.05 per share was paid within the required time frame. While Muni argues that His past services to BioTrack formed part of the consideration for the shares, the facts do not bear out the claim. I have concluded that the work Muni performed on behalf of BioTrack before April 29, 1998, was undertaken as part of Muni’s responsibilities as the president of DynaGen, and that Muni was fully compensated for his services to DynaGen. Accordingly, there are no past services for which Muni was owed any money at the time the BioTrack stock was offered, and therefore no valid argument can be made that Muni's past work represents at least part of the consideration for the shares. See, e.g. Belle Isle Corp. v. MacBean, 61 A.2d 699, 705 (Del.Ch. 1948) (shares issued to the defendant should be cancelled because he had been fully paid for his services, and there was no other consideration that had been paid).

At all relevant times BioTrack had 25,000,000 authorized shares of common stock.

Georgiev and O’Brien were not employed by DynaGen and thus not required to remain employed by DynaGen; they were obliged to remain with BioTrack.

Of course, BioTrack has already cancelled the shares; it did so in December 1998. Muni argues that the cancellation was invalid because BioTrack did not provide written notice to Muni in advance, an act which Muni claims was required by G.L.c. 156B, §22 (if Massachusetts law applies), or by 8 Del.C. §163. I disagree. Section 22 of G.L.c. 156B provides:
In the case of capital stock authorized to be issued for cash, whether or not to be paid in full before Issue, the directors may require payment in such proportions and at such times and places as they deem proper, by making demand therefor according to the by-laws, or, in the absence of such by-law, by notice mailed to each subscriber or stockholder at least seven days before his subscription or any portion thereof, or any installment due upon stock already issued, is payable.
(TheDelaware statute, 8 Del.Ch. §163, is similar, butprovides for 30 days notice rather than seven.) The two statutes appear by their terms to apply to stock which has been validly issued to a shareholder. As I conclude in the text, the 250,000 shares of BioTrack stock issued to Muni, reflected in the stock certificate delivered to him, are not valid because Muni did not furnish the required consideration for them. Furthermore, as BioTrack argues, if one looks beyond the threshold issue of validity vel non, one must confront the fact that Muni’s right to any BioTrack stock derives solely from the agreement entered into between him and the directors of BioTrack on April 29, 1998. Muni has no claim of entitlement to the stock divorced from that agreement, and two essential terms of that agreement were that (1) Muni pay the full strike price for the shares ($.05 per share, or $12,500), and (2) make the payment within six months of April 29. Muni did not comply with either of these terms. I do not read G.L.c. 156, §22, as imposing a notice provision on BioTrack which was not part of the company’s April 29 agreement with Muni. Rather, application of §22 in this context appears to mean that BioTrack permissibly could have demanded payment from Muni for the 250,000 shares before the six month grace period ended on October 29, 1998, by sending a written demand at least seven days before the demand date.

BioTrack’s complaint has a first count for declaratory relief concerning the status of the 250,000 shares at issue here, and five additional counts: to compel redeliveiy of stock (count II); replevin (count III); conversion (count IV); breach of contract (count V); and preliminary and permanent injunctive relief (count VI). Declaratory relief and injunctive relief will be granted consistent with the conclusions stated in the text. In light of this, and in view of the fact that BioTrack does not seek any monetary damages, the additional counts of the complaint (counts II through V) will be dismissed as duplicative.