**Len J. DILLON, Harold Gray and Fred R. Davis, Plaintiffs,**

v.

**F. Steven BERG et al., Defendants.**

**Civ. A. No. 3967.**

United States District Court,
D. Delaware.

May 6, 1971.

David T. Dana, III, of Richards, Layton & Finger, Wilmington, Del. and Andrew N. Grass, Jr., Francis E. Koch and James P. Conroy of Windels, Merritt &

Ingraham, New York City, of counsel, for plaintiffs.

Richard F. Corroon and Charles S. Crompton, Jr., of Potter Anderson & Corroon, Wilmington, Del., for defendants.

## OPINION

LATCHUM, District Judge.

This is a stockholders derivative suit brought by three of the directors of the Scotten, Dillon Company ("Scotten, Dillon"), Len J. Dillon ("Dillon"), Harold Gray ("Gray"), and Fred R. Davis ("Davis") against four of the directors or purported directors of the company, F. Steven Berg ("Berg"), William Lerner ("Lerner"), George K. Bissell ("Bissell"), and Ernest Summers ("Summers"), with Scotten, Dillon, a Delaware corporation, as a nominal defendant. Jurisdiction exists by virtue of Section 27 of the Securities Exchange Act of 1934 ("the Act"), 15 U.S.C. § 78aa, and venue is not contested.[1]

The plaintiffs allege that the proxy materials sent to all Scotten, Dillon shareholders in connection with the solicitation of proxies for the 1970 Annual Shareholders Meeting, held on August 21, 1970 in Wilmington, Delaware, (1) contained false and misleading statements and omitted material facts, in violation of Section 14(a) of the Act, 15 U.S.C. § 78n(a), and Rule 14a–9, 17 CFR § 240.14a–9, promulgated thereunder, and (2) failed to contain information prescribed by the Securities and Exchange Commission ("S.E.C.") in Schedule 14A, 17 CFR § 240.14a–101, in violation of Section 14(a) of the Act and Rule 14a–3, 17 CFR § 240.14a–3, promulgated thereunder. For relief, the plaintiffs request that the 1970 Annual Shareholders Meeting be declared illegal and void, that the election of defendants

Bissell and Summers to the Board of Directors ("the Board") be set aside, that Scotten, Dillon be ordered and directed to convene a meeting of shareholders as soon as possible for the purpose of acting on the matters which were or should have been considered by the 1970 Annual Shareholders Meeting, that defendant Lerner, as well as Bissell and Summers, be required to stand for election to the Board at such meeting, that defendants Bissell, Summers, and Lerner be enjoined from acting as directors of Scotten, Dillon until such time as they have been duly elected by the shareholders at such meeting, that Scotten, Dillon, its officers, agents, employees, attorneys, and assigns be enjoined from acting upon, effectuating, or enforcing any actions taken by the Board while defendants Bissell, Summers, and Lerner participated as members thereof, and that such further relief as necessary, just and proper be granted by the Court.

The defendants, in their answer to the original complaint, admit that Dillon is the beneficial owner of 3,100 shares of Scotten, Dillon stock, Gray is the beneficial owner of 10,100 shares, and Davis is the beneficial owner of 3,100 shares, and that all three have been shareholders during the period of time relevant to this suit.

It is now well established that a private party may bring suit for a violation of Section 14(a), J. I. Case Co. v. Borak, 377 U.S. 426, 430–431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), and that a shareholder may bring a derivative suit on behalf of the corporation for a violation of Section 14(a). Boothe v. Baker Industries, Inc., 262 F.Supp. 168, 174 (D.Del.1966); Greater Iowa Corp. v. McLendon, 378 F.2d 783, 794 (C.A.8, 1967); Bound Brook Water Co. v. Jaffe, 284 F.Supp. 702, 705 (D.N.J.1968).[2]

---

1. Scotten, Dillon stock is traded on the Detroit Stock Exchange, a national securities exchange registered under 15 U.S.C. § 78f.

2. The corporation itself has a right to bring a suit for a violation of Section

14(a). Studebaker Corp. v. Gittlin, 360 F.2d 692, 694–695 (C.A. 2, 1966); General Time Corp. v. Talley Industries, Inc., 403 F.2d 159, 161 (C.A. 2, 1968), cert. den. 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969).

The plaintiffs' standing to bring this suit is thus clear.[3]

A non-jury trial was held on December 29, 1970. Davis appeared as the sole witness for the plaintiffs and Berg appeared as the sole witness for the defendants. Almost fifty documentary exhibits were put in evidence by the plaintiffs, as well as a two volume deposition of defendant Lerner and certain answers to interrogatories propounded to the defendants. The defendants put into evidence fourteen documentary exhibits and a deposition of plaintiff Dillon. Posttrial briefing having been completed the case is now ripe for decision.

This case stems from a division of the Board of Directors of Scotten, Dillon into two opposing camps. One group consists of the plaintiffs, Dillon, who is the son of one of the company's founders and himself the former president and chairman of the Board, Gray, who is the chairman of the executive committee of the Board and the largest single stockholder in the company, and Davis, who is the vice chairman of the Board. The other group is composed of the defendants, Berg, who is the present chairman of the Board and chief executive officer of the company, Lerner, who is the secretary of the company, Summers, who is the executive vice president of the company, and Bissell, who is the chairman of the Board's stock option committee.

The roots of the present suit reach back to May 1, 1969 when a reorganization of the corporation, following the 1969 Annual Shareholders Meeting resulted in control of the corporation passing from Dillon, who had been Board chairman, to a group led by Terry J.

Fox ("Fox"), who, along with Berg, had been instrumental in creating a diversified small conglomerate, Iroquois Industries, Inc. ("Iroquois"). At the Board meeting held on May 1, 1969 the by-laws were amended to make the chairman of the Board the chief executive officer of the corporation, and additional executive positions were created. (PX–23, pp. 2–4). Fox was elected chairman of the Board, Davis was elected vice chairman, and Gray was elected chairman of the newly created executive committee. In addition, Ralph R. Power ("Power"), another director of the company, was reelected president. (PX–23). Power had served as president since August 1968, when he had succeeded Dillon upon Dillon assuming the position of Board chairman. (Docket Item # 58, pp. 12, 26–27).

At the next Board meeting, held on June 19, 1969, the number of directors was increased from seven to nine, Fox resigned as chairman of the Board and as a director because of the demands on his time made by Iroquois, Berg was elected to replace Fox as chairman of the Board and the terms of an employment contract between Berg and the company were approved, Lerner was elected to fill Fox's unexpired term on the Board,[4] and Bissell was elected to fill one of the two newly created directorships. (PX–24). The second newly created directorship was not filled.

Philip G. Moon ("Moon"), another Scotten, Dillon director, resigned in October 1969. At the October 30, 1969 Board meeting Lerner was elected to fill Moon's unexpired term and Bissell was elected to fill Lerner's unexpired term. (PX–26). After this, the nine-director

---

3. The plaintiffs, additionally, claim standing as directors, irrespective of their stock holdings. While a director's potential liability under Section 14(a) of the Act or under Section 18 of the Act, 15 U.S.C. § 78r, might be enough to give a non-stockholding director standing to bring a derivative suit on behalf of the corporation, the Court does not have to reach this issue in the present case because of the plaintiffs' standing as share-

holders. Note and compare Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842, 843 (C.A. 2, 1970); Kehaya v. Axton, 32 F.Supp. 266 (S.D.N.Y.1940); H. Henn, Law of Corporations (2d ed. 1970) § 217.

4. The Board is divided into three classes, with each class serving three years. Article IV, section 2 of Scotten, Dillon by-laws. (PX–35).

Board consisted of seven members, Dillon, Gray, Davis, Berg, Lerner, Bissell and Power and two unfilled positions, the directorships created at the June 19, 1969 meeting, one having previously been filled by Bissell and the other having never been filled.[5]

These seven worked together fairly harmoniously until early in 1970. Sometime between the October 30, 1969 directors meeting and the March 9, 1970 meeting dissension arose, apparently over the relocation of the corporation's main manufacturing operations from Detroit to Gallipolis, Ohio, over problems which developed in purchasing from Fox 90,000 shares of Iroquois stock, over difficulties arising from an attempt by Berg to have his employment contract rescinded, and over a personality conflict between Berg and Power. The split widened when a controversy arose between the members of the Board as to whether a purported resignation of Power from the Board in March of 1970 was effective.

By the time of the July 22, 1970 meeting the Board had become sharply divided into two hostile camps, with Dillon, Gray, and Davis on one side and Berg, Lerner, and Bissell on the other. (Tr. 15). The validity of that meeting and the acts done there constitute the major focus of the plaintiffs' claims, particularly since a purported election of Summers to the Board at that meeting gave Berg and his faction firm control of the Board. The exact cause of action asserted by the plaintiffs is that the proxy materials prepared by Berg and his faction and used as soliciting materials for the 1970 Annual Shareholders Meeting violated Federal proxy regulations.

The plaintiffs' claim, that the proxy materials for the 1970 Annual Shareholders Meeting violated Section 14(a) of the Act and Rules 14a–3 and 14a–9 promulgated thereunder, involves the resolution of a number of issues. Among these are the validity of the July 22, 1970 Board meeting, the effect of the purported resignation by Power in March of 1970, the validity of the purported election of Summers to the Board at the July 22, 1970 meeting, the legality of labeling the proxy materials in question "management," the accuracy of statements made about the company's 1969 Qualified Stock Option Plan, the propriety of failing to disclose in the proxy materials information concerning stock warrants issued to Berg but cancelled before their use, the consequences of not updating the 1969 Annual Report of the company, the effect of not notifying stockholders of the existence of the

---

5. The status of the board members can be graphically illustrated as follows:

### DIRECTORS AS OF DATE OF EACH BOARD MEETING

| Term Expires: | May 1 1969 | June 19 1969 | August 25. 1969 | October 30 1969 | March 9 1970 | April 13 1970 | May 5 1970 | July 22 1970 |
|---|---|---|---|---|---|---|---|---|
| 1972 | Berg | Berg | Berg | Berg | Berg | Berg | Berg | Berg |
| 1972 | Moon | Moon | Moon | *Lerner* | *Lerner* | *Lerner* | *Lerner* | *Lerner* |
| 1970 | Fox | *Lerner* | *Lerner* | *Bissell* | *Bissell* | *Bissell* | *Bissell* | *Bissell* |
| New Position | — | *Bissell* | *Bissell* | VACANT | VACANT | VACANT | VACANT | VACANT |
| 1970 | Power | Power | Power | Power | *Power* | *Power* | *Power* | { *Summers* *Power* } |
| New Position | — | VACANT | VACANT | VACANT | VACANT | VACANT | VACANT | VACANT |
| 1972 | Gray | Gray | Gray | Gray | Gray | Gray | Gray | Gray |
| 1971 | Davis | Davis | Davis | Davis | Davis | Davis | Davis | Davis |
| 1971 | Dillon | Dillon | Dillon | Dillon | Dillon | Dillon | Dillon | Dillon |

*Italics* denotes position in issue.

two unfilled directorships, the propriety of not disclosing an increase in Summers' salary for the coming year, the materiality of numerous admitted misstatements in the proxy materials, and several other matters which will be discussed in the course of this opinion. The defendants have denied the principal allegations of the plaintiffs. Each of the major issues will be discussed separately.

*Validity of the July 22, 1970 Board Meeting*

At the outset, the plaintiffs contend that the election of Summers to the Board, the nomination of Bissell and Summers as management nominees for election to the Board by the stockholders at the 1970 Annual Shareholders Meeting, and the delegation of authority to prepare the proxy materials and to set the date for the annual meeting were all invalid because of the illegality of the July 22, 1970 Board of Directors meeting held at the company's offices in Buffalo, New York.

The plaintiffs claim that the July 22, 1970 Board meeting was invalid because the quorum for the meeting was obtained by trickery. This charge principally originates from the absence of Gray from the meeting due to illness, and the resulting three to two division among the other directors present at the meeting. Gray, suffering from pleurisy, was unable to fly from his home in Florida to Buffalo to attend the meeting. Gray informed Davis of this fact, whereupon Davis telephoned Berg and requested that the meeting be postponed or moved to Florida. (Tr. 18–19; 47). When Berg refused to do either, Davis asked Berg whether he had any intention of taking advantage of Gray's absence. (Tr. 19 & 48). Berg assured Davis that he had no such intention. (Tr. 48). Consequently, Davis and Dillon both attended the meeting. (PX–30).

At the meeting Lerner introduced a resolution to elect Summers to replace Power on the Board, to name Bissell and Summers as management nominees for election to the Board by the stockholders at the 1970 Annual Shareholders Meeting, and to delegate to the company's executive officers the task of setting the date of the meeting and preparing proxy materials for it.[6] Because the resolution covered matters not listed on the printed agenda for the Board meeting, and the resolution was considered by Davis to contravene Berg's assurances, Davis protested vigorously. (PX–30, p. 17). Yet, both he and Dillon voted against the resolution and continued to participate in the meeting. The plaintiffs contend that the defendants, by assuring them that the status quo would not be altered and then concealing from them the fact that Lerner's resolution would be introduced, obtained their presence at the meeting and established a quorum through trickery.

While it is probably true that under Delaware law a Board meeting would be illegal where the quorum was obtained by fraud, deceit, duress, or trickery, such a rule is not applicable to this case. It is well established that the rule against obtaining a quorum through trickery does not apply where the director who has allegedly been tricked not only attends the meeting but also remains and participates in the entire meeting and in all its proceedings. 2 Fletcher, Cyclopedia of Corporations (Perm.Ed.1969) § 422. Accordingly, the July 22, 1970 Board meeting was not illegal on the ground that the quorum was improperly obtained and the action taken at the meeting was not invalid *per se.* Consequently, the events which occurred at the July 22, 1970 Board meeting, like the other events involved in this case, must be scrutinized individually in light of the statements made in the proxy materials, in order to ascertain whether Section 14(a) of the Act was violated.

*Resignation of Power*

Prior to the March 9, 1970 Board meeting, held in Buffalo, New York,

---

6. The validity of this resolution will be discussed later in this opinion.

Berg informed both Power and Davis that he would not be willing to have Power run as a candidate for reelection to the Board at the 1970 Annual Shareholders Meeting unless he, Berg, was given Power's undated resignation from the Scotten, Dillon Board. (Tr. 16). Berg and Power then stepped out of the meeting room and discussed the matter privately. As a result of their discussion, Power typed up and gave to Berg an undated resignation, worded to take effect immediately. After this occurred, but still prior to the Board meeting, Berg informed Davis that he had obtained Power's undated resignation and was holding it.

No announcement was made at the Board meeting and no notice was given at that time to any other director concerning this resignation. (Tr. 16). Power participated in the meeting as a full voting director and was so noted in the minutes. Resolutions were introduced and seconded by Power without objection. (See PX–27).

Another Board meeting was held on April 13, 1970. Once again, Power participated fully in the proceedings. No notice or announcement of the resignation was made and the minutes reflected Power's status as a director. (PX–28). It was after this meeting that the confusion developed.

Power apparently had second thoughts concerning the undated resignation he had given Berg on March 9. On April 24, 1970, Power wrote a letter to Berg and sent copies to the other directors, in which he stated, "Prior to the meeting of the Board of Directors on Monday,

March 9, you demanded and received my undated resignation from the Board. Upon careful consideration I am herewith withdrawing that resignation and will continue to serve as a director." (PX–8). It is apparent from the record that when Berg learned of Power's wish to withdraw the undated resignation which he had previously given Berg upon the latter's demand, Berg dated the resignation "April 14, 1970" and sent out a letter to the other directors, dated "April 20, 1970", informing them of the resignation.[7] This conclusion is substantiated (a) by Davis' testimony at trial that Power's withdrawal letter, though dated four days *after* Berg's letter, was actually received by him *before* Berg's letter, (Tr. 17 and 33), and (b) by a letter, placed in evidence by the plaintiffs, dated April 14 from Berg to the other directors, relative to setting a time for the 1970 Annual Shareholders Meeting, which listed Power's name and address as a director and which contained no mention of his resignation. (PX–9).

Power appeared at the next Board meeting, which was held on May 5, 1970 in New York City, and requested clarification of his status. Berg again announced that the resignation had been received and ordered a copy to be annexed to the minutes of the meeting. (PX–29). The minutes, kept by Lerner, stated that Power was present only by invitation and was not seated as a director. (PX–29). While the minutes do not so indicate, there was testimony that Power voted on resolutions pertaining to a potential merger of Scotten, Dillon

---

7. The body of this letter (PX–14) reads as follows:
   "This is to advise you that we have received the signed resignation, under date of April 14, 1970, of Ralph R. Power as a Director of our company, effective immediately, a copy of which is enclosed.
   "I look forward to receiving your suggestions of possible candidates for this vacancy."
   The copy of the resignation enclosed reads:

"April 14, 1970
"Board of Directors
Scotten, Dillon Company
2515 Main Place Tower
Buffalo, New York 14202
"Gentlemen:
   "I herewith tender my resignation as a Director of Scotten, Dillon Company effective immediately.
        Very truly yours,
        /s/ Ralph R. Power
             Ralph R. Power"

with Iroquois.[8]  The Board was divided as to Power's status and a suggestion was made that outside counsel investigate the situation and report back, (Tr. 17), but apparently this was never done. (Tr. 18).

Power was again present at the July 22, 1970 directors' meeting held in Buffalo, New York.  Again the minutes indicate that he was present by invitation and not seated as a director.  (PX–30). At this meeting a heated controversy over Power's status was triggered by the proposal, made by Lerner, to elect Summers to fill the vacancy on the Board created by the purported resignation of Power.  Because of Gray's absence due to illness Summers was elected to replace Power by a vote of three (Berg, Lerner, and Bissell) to two (Dillon and Davis),[9] with Power not voting.

Since the proxy materials stated in two places that Power had resigned as a director and Summers had replaced him, and since there was no explanation of the circumstances herein narrated, the plaintiffs charge that the proxy statement violated Section 14(a) of the Act, 15 U.S.C. § 78n(a), and Rules 14a–3 and 14a–9 promulgated thereunder.

■ There would appear to be no doubt that if Power were in fact a director but was not so listed on the proxy statement, a violation of Section 14(a) has occurred.  Rule 14a–3, 17 CFR 240.14a–3, requires that a written proxy statement containing the information specified in Schedule 14A, 17 CFR § 240.14a–101, be furnished to all shareholders.  Item 6 of Schedule 14A requires the disclosure of the names, term of office, and other information about each director of the company.  Therefore, the failure to list the name of a director in the proxy statement would constitute a clear violation of Section 14(a) of the Act.  For this reason, the Court must ascertain whether Power

was, in fact, a director of Scotten, Dillon or whether he had effectively resigned at the time the proxy material was mailed.

The relevant provision of the General Corporation Law of Delaware on director resignation, a portion of 8 Del.C. § 141(b), states, "Any director may resign at any time upon written notice to the corporation."  The legislative history of this statutory enactment sheds some light on its purpose.

In Young v. Janas, 34 Del.Ch. 287, 103 A.2d 299, 302 (1954) then Chancellor Seitz "reluctantly" followed the old case of Lippman v. Kehoe Stenograph Co., 11 Del.Ch. 190, 98 A. 943 (1916), aff'd 11 Del.Ch. 412, 102 A. 988 (Del.Supr.1918) and held that the resignation of a corporate director was ineffective where it had never been accepted by the Board. The Chancellor's opinion invited a consideration of the issue by the legislature.

In response to this, in 1955, the Delaware General Assembly added the sentence quoted above to section 222 of the existing law.  50 Del.Laws, Ch. 467, § 1. When the new General Corporation Law was adopted in 1967 the provisions relating to the Board of Directors were placed in section 141, but this particular provision was omitted.  It was restored to the General Corporation Law and made a part of section 141(b) by the Technical Amendments Act of 1968, § 3. 56 Del.Laws, Ch. 186, § 3.  No Delaware decisions have been found by the Court since Young v. Janas dealing with the problem of director resignations.

■ The legislative history of the phrase, "Any director may resign at any time upon written notice to the corporation," indicates that the purpose of this provision was to prevent a corporate director who desired to resign from having his status placed in doubt by a refusal or failure of the Board to act. The logical interpretation of the provi-

---

8.  However, Lerner in his deposition stated that he did not believe Power voted on the resolutions.  (PX–44, p. 46).

9.  The validity of Summers' election will be considered later in this opinion.

sion is that acceptance is no longer essential to effect a valid resignation by a director.

■ From the requirements of 8 Del.C. § 141(b) it can also be inferred that it was the policy of this legislation that a resignation be unequivocal, in writing, and that it be communicated to the corporation. The necessity for written notice to the corporation before a director's resignation becomes effective clearly indicates an intent to outlaw secret, covert resignations in order to enable the other directors to know at all times the status of their fellow directors. Therefore, the Court interprets the phrase "written notice to the corporation," used in 8 Del.C. § 141(b) in connection with the resignation of a director, to mean actual written notice to each and every member of the Board of Directors or actual written notice to an agent of the corporation, such as its Chairman of the Board, President, or Secretary.

■ Giving actual written notice to an agent of the corporation would, in the normal case, meet the statutory requirements of 8 Del.C. § 141(b) because of the well established rule that a corporation is charged with constructive knowledge of all material facts of which its agent receives notice, while acting within the scope of his authority, even though the agent fails to communicate his knowledge to the corporation. 3 Fletcher, Cyclopedia of Corporations (Perm.Ed.1965) § 790. However, this general rule does not apply where the corporate agent's relation to the subject matter is substantially adverse to the corporation. Cf. 3 Fletcher, Cyclopedia of Corporations § 789. In the present case, when logically analyzed, the understanding reached between Berg and Power, just prior to the March 9, 1970 Board meeting, amounted to a covert agreement between the two in which Berg consented to support Power's re-election to the Board at the upcoming shareholders' meeting in exchange for Berg obtaining the right to remove Pow-

er at any time, without cause. Obviously, in light of Berg's shaky position, with his status as the corporation's chief executive officer supported by only three of the seven members of the sharply polarized Board, it was to his advantage to neutralize Power's potentially hostile vote. Berg's obtaining Power's undated resignation was done on his own behalf and in his own interest and not as an agent of the corporation. Therefore, Berg's receipt of Power's undated resignation on March 9, 1970 did not constitute "notice to the corporation," as required by 8 Del.C. § 141(b).

■ Nor could Berg's later communication of news of Power's resignation to the other directors make the resignation effective. While there is a sharp conflict in the evidence as to whether Berg informed the other directors of Power's resignation before or after Power revoked it, the Court does not have to resolve the issue because the Court is of the opinion that the covert agreement giving Berg the authority to remove Power at any time without cause was void and unenforceable under Delaware law.

■ The General Corporation Law of Delaware is silent as to the right to remove a director of a Delaware corporation without cause. However, prior to the 1967 enactment of the new General Corporation Law there was strong indication that removal of a director without cause would be invalid under Delaware law. In Essential Enterprises Corp. v. Automatic Steel Products, Inc., 39 Del.Ch. 93, 159 A.2d 288 (1960) then Chancellor Seitz held that a by-law which provided for the removal by stockholders of a director without cause was invalid because it was in conflict with the certificate of incorporation, which, however, the Chancellor emphasized, was virtually a word for word restatement of the applicable statutory provision. While the invalidity was based exclusively upon the by-law's conflict with the certificate of incorporation, it is obvious that a conflict with the statute was inev-

itably present, also.[10] 39 Del.Ch. at 98, 159 A.2d at 291.

In Everett v. Transnation Development Corp., 267 A.2d 627 (Del.Ch.1970) Vice Chancellor Marvel faced the question of the validity, under the 1967 General Corporation Law, of a by-law providing for the removal of a director without cause by the shareholders.[11] In upholding the by-law, the Vice Chancellor held, in effect, that the part of 8 Del.C. § 141(b) which reads, "Each director shall hold office * * * until his earlier resignation or removal," had overruled the Essential Enterprise Corp. case.

From this, an argument could be made that 8 Del.C. § 141 will allow any kind of director removal to be legal, including the removal of a director without cause by the Board or even, as in the present case, by an individual director. This Court does not read the Vice Chancellor's opinion so broadly. It is instead the view of this Court that the Vice Chancellor's opinion only allows corporate by-laws to provide for removal of a director, without cause, *by the shareholders*.

To allow the Board to remove one of its own members at any time without cause would seem to be completely violative of shareholder rights. It would be absurd to require an annual meeting of shareholders to elect directors and then allow the remaining members of a staggered Board to remove the newly elected directors without cause and replace them, in total frustration of the stockholders' voting rights. In the opinion of this Court such a provision would violate 8 Del.C. § 211 et seq. and the public policy of the State of Delaware and would thus be void and unenforceable. H. Henn, Law of Corporations (2d Ed. 1970) § 205, p. 413; Cf. 2 Fletcher, Cyclopedia of Corporations (Perm.Ed.1969) § 348.

To allow the removal of one director, without cause, by another director through the vehicle of obtaining a secret, undated resignation as a *quid pro quo* for allowing an uncontested reelection to the Board is an even more serious violation of Delaware law. It would require this Court to go far beyond the bounds of logic to stretch Vice Chancellor Marvel's opinion in *Everett* to allow such an arrangement to be valid. Therefore, this Court holds that the purported resignation of Power, obtained by means of this illegal agreement, can be given no force and effect under Delaware law.

The conclusion is thus inescapable that Power never effectively resigned as a director of Scotten, Dillon. Therefore, the omission of his name and the other information required to be on the proxy statement by Schedule 14A constituted a violation of Rule 14a-3.[12]

*Election of Summers*

The plaintiffs have alleged that the election of Summers to the Board at the July 22, 1970 meeting was invalid because only three directors (Berg, Bissell, and Lerner) out of the seven [13] then in office voted for his election. (See PX–30). The plaintiffs' contention is well founded.

10. The right of stockholders to remove a director with cause is now established under Delaware law. See Campbell v. Loew's Inc., 36 Del.Ch. 563, 134 A.2d 852, 857–858 (1957).

11. The by-law provision also allowed a director to be removed with cause by either the Board or the stockholders. 267 A.2d at 629.

12. In addition it should be noted that Schedule 14A, 17 CFR § 240.14a–101, Item 6(b), provides:

"(b) If any nominee for election as a director is proposed to be elected pursuant to any arrangement or understanding between the nominee and any other person or persons, except the directors and officers of the issuer acting solely in that capacity, name such other person or persons and describe briefly such arrangement or understanding."

13. The seven directors then in office included Power, whose resignation has been found to have been ineffective.

Title 8 Del.C. § 223(a) provides, in part:

"(a) Unless otherwise provided in the certificate of incorporation or by-laws, vacancies and newly created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors *then in office*, although less than a quorum, or by a sole remaining director." (Emphasis added.)

The certificate of incorporation (PX–34) is completely silent concerning interim elections to fill vacancies and newly created directorships. The only provisions of the by-laws (PX–35) pertaining to these matters are Article IV, sections 3 and 5. Section 3 reads:

"SECTION 3. *Vacancies.* If the office of any director becomes vacant by reason of death, resignation, disqualification, increase in the number of directors or otherwise, the remaining directors may, at any regular or special meeting of the Board of Directors at which a quorum is present, elect a successor who shall hold office for the unexpired term of such director. However, in the case of an interim appointment to fill a vacancy created by an increase in the number of directors, the interim director or directors shall serve only until the next annual meeting of stockholders."

Section 5 provides in part:

"SECTION 5. *Quorum.* A majority of the members of the Board of Directors shall constitute a quorum for the transaction of business * * *."

Neither section specifies the voting strength necessary to elect a director to fill a vacancy or newly created directorship.

In the case of In re Chelsea Exchange Corporation, 18 Del.Ch. 287, 159 A. 432, 434–435 (1932) the Delaware Court of Chancery considered a predecessor statute of 8 Del.C. § 223, Rev.Code 1915, § 1944, as amended by 35 Del.Laws, c. 85, § 14, and held that where the certificate of incorporation was silent and the by-laws only contained (1) a provision for vacancies to be filled by the remaining members of the Board and (2) a definition of what constituted a quorum of the Board, the statutory majority of those directors then in office was required.[14] The by-laws of the corporation involved in that case being virtually identical, except for the quorum requirements, with the by-laws of Scotten, Dillon involved here, that case controls.

■ Since Summers was elected by the vote of only three directors of the seven then in office (PX–30, pp. 18–19), his election was not by "a majority of the directors then in office," as required by 8 Del.C. § 223, and consequently he was not validly elected a director at the July 22, 1970 directors' meeting.[15] From this it must be concluded that the statements in the proxy materials that Summers had been elected at the July 22 meeting to fill the unexpired term of Power were false.

*Labeling Proxy Materials "Management"*

■ The plaintiffs have alleged that Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), was violated by the designation of the proxy materials mailed and the proxies solicited as being prepared by and solicited on behalf of the management.[16]

---

14. Tomlinson v. Loew's Inc., 36 Del.Ch. 516, 134 A.2d 518, 523 (1957), aff'd 37 Del.Ch. 8, 135 A.2d 136 (Del.Supr. 1957) construed language in a corporation's by-laws requiring a quorum for Board action as only superseding the statute to the extent that the statute would allow a vacancy to be filled by less than a quorum of the Board when a quorum was actually in office.

15. Summers' status as a de facto director or the validity of corporate acts done by him are not before this Court in the present suit.

16. See Rule 14a–4(a), 17 CFR § 240.14a–4(a).

The plaintiffs further object to Bissell and Summers' designation in the proxy materials in question as "management" nominees. The resolution of these two issues centers around the validity of two parts of the controversial three part resolution proposed by Lerner at the July 22, 1970 Board meeting.[17]

Title 8 Del.C. § 141(b) provides in part:

> "The vote of the majority of the directors present at a meeting at which a quorum is present shall be the act of the board of directors unless the certificate of incorporation or the by-laws shall require a vote of a greater number."

Counting Power, there were six directors present at the July 22, 1970 Board meeting. Under the Scotten, Dillon by-laws six out of eight is more than sufficient to constitute a quorum of the Board.[18] However, from the minutes (PX–30, pp. 18–19) and from the testimony at trial (Tr. 22) it is clear that the resolution in question was adopted by a vote of three (Berg, Lerner, and Bissell) to two (Dillon and Davis), with Power not voting. It is established that where a statute requires a vote of a majority of directors present to pass a resolution, a director who is present and does not vote at all on the resolution is counted in the negative for the purpose of determining whether the resolution has been carried by a majority vote. 2 Fletcher, Cyclopedia of Corporations (Perm.Ed.1969) § 425. Therefore, the vote of three out of the six present was insufficient to pass the resolution.

Because of the invalidity of this resolution, the delegation of authority to the executive officers to prepare the proxy materials and the nomination of Bissell and Summers as management nominees for election to the Board were invalid.[19] As a consequence, the designation of the proxy materials, drawn up only by Berg and the members of his faction and not authorized by the Board, cannot be regarded as "management." Cf. Empire Southern Gas Co. v. Gray, 29 Del.Ch. 95, 46 A.2d 741 (1946). Thus, the statements that the proxy solicita-

---

17. Because of the requirements of 8 Del.C. § 223(a), that portion of the resolution which purported to elect Summers to the Board has been found to be invalid. It is the remaining two paragraphs of the resolution which are at issue here. Those paragraphs read as follows:

> "FURTHER RESOLVED, that Ernest Summers and George K. Bissell be, and they hereby are designated as the nominees for director at the 1970 Annual Meeting to be held in Wilmington, Delaware forthwith.

> "FURTHER RESOLVED, that the executive officers of the Company shall promptly designate and fix the record date for voting at, and the time and date of the 1970 Annual Meeting, as related to the time necessary for the clearance of the proxy materials with the Securities and Exchange Commission and in such form as counsel shall indicate." (PX–30, p. 19).

18. Article IV, section 5 of the Scotten, Dillon by-laws, quoted supra, provides that a quorum consists of a majority of the members of the Board. Under Delaware law this means a majority of the entire Board, notwithstanding any vacancies which may exist. Bruch v. National

Guarantee Credit Corp., 13 Del.Ch. 180, 116 A. 738, 740 (1922). However, under Delaware law newly created but never filled directorships are not counted in determining the number of directors constituting the entire board. Belle Isle Corp. v. MacBean, 30 Del.Ch. 373, 61 A.2d 699, 702–703 (1948), note Blish v. Thompson Automatic Arms Corp., 30 Del. Ch. 538, 64 A.2d 581, 599 (Del.Supr. 1948). Because one of the two new directorships created at the June 19, 1969 Board meeting (See PX–24) was filled, though it remained filled for only a short while, the quorum defined by the Scotten, Dillon by-laws consisted of a majority based upon *eight* positions, in spite of the fact that only seven directors actually held office at the time.

19. It should also be noted that the resolution removing Power as president of the corporation and the resolution forming a new executive committee were also invalid for the same lack of majority approval. Therefore, the statement in the proxy materials that Power had been removed as president on July 22, 1970 was also false, though the plaintiffs have not raised the issue.

tion was being done on behalf of "management" and that Bissell and Summers were the "management" nominees to the Board were false.

*Stock Option Plan*

■■■ The proxy statement mailed to Scotten, Dillon stockholders in connection with the 1970 Annual Shareholders Meeting contained information relating to the company's 1969 Qualified Stock Option Plan ("the Plan"), which was scheduled to come before the meeting for stockholder approval. Specific space was provided on the proxy for the stockholders to indicate their vote on the adoption of the Plan. However, the Plan was not actually presented to the meeting, apparently because those employees who would have been eligible to receive options under the Plan renounced any desire for such options. (Tr. 76). Since the Plan was not presented to the stockholders, it expired by its own terms. (See PX–26).

The plaintiffs contend that the proxy statement was false and misleading in that it stated that on December 30, 1969, pursuant to the Plan adopted by the Board on October 30, 1969, Summers received an option to purchase 5,000 shares of the company's stock. The defendants deny that the statement was false and, in addition, assert that the failure to submit the Plan to the shareholders mooted the issue, making any false or misleading statements as to that matter non-material.

It is clear from the testimony both on deposition and at trial that the Stock Option Committee, composed of Bissell, Davis, and Lerner, never held an actual meeting.[20] (Tr. 23–24; Tr. 57–61). There was testimony that the three members of the Stock Option Committee orally agreed to granting Summers an option on 5,000 shares (Tr. 59), but apparently the paper minutes prepared to show this grant were never signed.

■■■ However, the Court is of the opinion that because the 1969 Qualified Stock Option Plan was never presented to the stockholders for their approval, this issue has been rendered moot. Cf. Globus, Inc. v. Jaroff, 279 F.Supp. 807 (S.D.N.Y.1968). Where the allegedly false and misleading statements made in the proxy materials pertain to a matter to be voted upon separately from other matters to come before the shareholders, the withdrawal of that particular matter from the shareholders' consideration will render such statements non-material and thus non-violative of Section 14(a) of the Act and Rule 14a–9, unless the statements made were so grossly false and misleading as to permeate the entire proxy materials to such an extent that a shareholder would be so lured or enticed by those statements into casting his vote in favor of the soliciting party on other matters that the shareholder's independent judgment on the other matters would be overborne. Cf. Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

■■■ Applying this to the facts of the present case, it is obvious that the misstatement concerning Summers' receipt of an option on 5,000 shares was not grossly false and misleading, did not permeate the entire proxy statement (PX–38), and would not have lured or enticed a shareholder into voting in favor of the defendants' position on other matters to come before the meeting. Therefore, the plaintiffs' claim based upon the statements in the proxy material concerning the 1969 Qualified Stock Option Plan must fail.

*Berg's Stock Warrants*

Under the employment contract between Berg and Scotten, Dillon, dated June 19, 1969 and approved by the Board at the August 25, 1969 Board meeting, Berg was granted warrants to purchase up to 40,000 shares of the corporation's common stock. (PX–25, p.

---

20. Lerner insisted in his deposition testimony that a meeting had actually been held, but was unsure of the exact date. (PX–44A, pp. 164–168).

11). At the July 22, 1970 Board meeting Berg's offer to cancel the warrants was accepted by a resolution of the Board unanimously adopted.[21] While the proxy materials prepared for an abortive April 1970 Shareholders Meeting,[22] but never mailed, disclosed the existence of the warrants, (PX-40), the proxy materials in question in the present suit contained no information about the warrants or their cancellation. (PX-39).

The plaintiffs contend that Rule 14a-3 was violated by the failure to disclose the existence of and cancellation of these warrants. The defendants argue that since the warrants were cancelled without ever having been exercised, no disclosure was necessary. In addition, the defendants point out that they specifically called the S.E.C.'s attention to the fact that information about the warrants was omitted in the later filed proxy materials, and the S.E.C. took no action. (See PX-17).

■ The applicable requirements are contained in Item 7(d) of Schedule 14A, 17 CFR § 240.14a-101. Item 7(d) provides, in part, as follows:

"(d) Furnish * * * information as to all options to purchase any securities from the issuer or any of its subsidiaries *which were granted to* or exercised by [the directors or officers] *since the beginning of the issuer's last fiscal year* * * *." (Emphasis added).

It is not disputed that the proxy materials for the August 21, 1970 Annual Shareholders Meeting omitted any mention of these warrants. Since Rule 14a-3 requires all information specified in Schedule 14A, 17 CFR § 240.14a-101, to be supplied to the stockholders, the failure to disclose the issuance of the warrants and their cancellation was a clear violation of Section 14(a) of the Act.

■ The S.E.C.'s failure to take legal action against the defendants in connection with the omission of information about Berg's warrants does not compel this Court to reach a contrary result. Rule 14a-9(b) provides:

"(b) The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made."

The failure of the S.E.C. to take legal action can be accorded no weight in the present case.[23]

*Failure to Update Annual Report*

Accompanying the proxy materials sent out to new stockholders [24] in connection with the 1970 Annual Meeting was a copy of the 1969 Annual Report, containing statements about the financial condition of the company as of December 31, 1969. The plaintiffs do not contend that the 1969 Annual Report

21. Apparently Power, although present, did not vote and Berg, Bissell, Lerner, Dillon, and Davis all voted affirmatively.

22. April 29, 1970 had been originally set as the date for the Annual Shareholders Meeting, at which time a proposed merger between Scotten, Dillon and Iroquois was to have been voted upon. When the merger fell through, a new date, August 21, 1970, was set and new proxy materials were prepared.

23. Some courts have accorded some weight to S.E.C. inaction, particularly where

the identical claims have been presented to the S.E.C. for its consideration or where a preliminary injunction has been sought. See Armour & Co. v. General Host Corp., 296 F.Supp. 470, 475 (S.D. N.Y.1969); Abramson v. Nytronics, Inc., 312 F.Supp. 519, 526 (S.D.N.Y.1970) and cases cited therein.

24. "New stockholders" meaning those who had become stockholders between April 30 and July 24, 1970 and who therefore had not been previously mailed the 1969 Annual Report.

failed to disclose correctly the financial condition of Scotten, Dillon as of December 31, 1969. Instead, the plaintiffs contend that by August 3; 1970, the date the proxy materials were mailed, certain statements and information had ceased to be accurate, because of events which had occurred during the seven month period after the date of the annual report. According to the plaintiffs, the failure to update the statements in the report resulted in a violation of Rule 14a–9. The defendants, on the other hand, contend that Rule 14a–3(c) insulates them from any liability, and that, in any event, they complied literally with the provisions of Rule 14a–3(b), which requires the management to mail shareholders an annual report accurately reflecting the corporation's financial condition prior to or concurrently with the proxy statement when directors are to be elected at the annual meeting.

There is some dispute as to whether there was literal compliance with Rule 14a–3(b). The record contains an affidavit that the proxy statement was mailed on August 3, 1970. (PX–4). Another affidavit states that the annual reports sent to shareholders who became shareholders after April 30, 1970 were mailed on August 3, 4 and 5. (PX–6). All who were stockholders on April 30 had been mailed a copy of the annual report on May 8, 1970. (PX–6).

If the solicitation had been made on behalf of management, the mailing of the company's annual report to some of its stockholders subsequent to the mailing of its proxy statement would have been a technical violation of Rule 14a–3(b). However, because the Court has found that the solicitation was not in fact a "management" solicitation, the defendants could not have violated Rule 14a–3(b).

Even if the solicitation had been by the management, the Court must reject the plaintiffs' contentions that liability should be imposed upon the defendants under Rule 14a–9 for their failure to include in the proxy materials for the 1970 Annual Shareholders Meeting information amplifying and elucidating statements in the annual report which had allegedly become dated by the time the report was distributed to new stockholders.[25]

Rule 14a–3(c) provides, in part:

"The annual report is not deemed to be 'soliciting material' or to be 'filed' with the Commission or *subject to this regulation otherwise than as provided in this rule*, or to the liabilities of section 18 of the Act, except to the extent that the issuer specifically requests that it be treated as a part of the proxy soliciting material or incorporates it into the proxy statement by reference." (Emphasis added).[26]

It is undisputed that Scotten, Dillon did not *specifically request* that its annual report be treated as part of the soliciting material and did not incorporate it by reference in its proxy statement.

While some commentators appear to regard Rule 14a–3(c) as merely providing immunity from liability under Section 18 of the Act, 15 U.S.C. § 78r, see 2 Loss, Securities Regulation (1961) 887–888 and 5 Loss, Securities Regulation (Suppl.1969) 2850, the Court is of the opinion that a careful reading of the rule, particularly the language emphasized, compels the conclusion that Rule 14a–3(c) exempts the annual report and the statements contained in it from liability imposed under any rule, other than Rule 14a–3, promulgated under Section 14(a) of the Act, including Rule 14a–9. The term "this regulation" used in the phrase "subject to this regulation" obviously refers to Regulation 14A, which includes all rules promulgated under Section 14(a), 17 CFR § 240.-14a–1 et seq.

25. The plaintiffs do not contend that the statements in the annual report failed to "indicate the general nature and scope of the business" of Scotten, Dillon, as required by Rule 14a–3(b) (5).

26. When a proxy contest occurs, Rule 14a–11(f) substantially limits this. Note also Item 15 of Schedule 14A.

██ Because no liability may be imposed under Federal proxy rules, other than Rule 14a–3, for any false or misleading statement or material omission contained in the corporation's annual report, the annual report must be disregarded for purposes of determining whether the proxy materials violated Section 14(a) or the rules promulgated thereunder. The standards set by Rule 14a–3(b) for annual reports differ substantially from the standards set by Rule 14a–9 for proxy materials. To require the proxy materials to supplement the annual report would frustrate the purpose of Rule 14a–3(c) and nullify the terms of Rule 14a–3(b). It would be tantamount to holding that an annual report is automatically incorporated by reference in any proxy statement which accompanies the annual report. Therefore, the failure to update the annual report or to correct any false or misleading statements in the report or to supply any information omitted from the report cannot give rise to liability under Section 14(a), except insofar as the annual report itself violates Rule 14a–3.[27]

*Number of Positions on Board of Directors*

The plaintiffs contend that the proxy materials violated Rule 14a–3 because they did not disclose the fact that, while only two nominees to the Board were before the stockholders for election, four vacancies actually existed by virtue of the expansion of the Board to nine at the June 19, 1969 Board meeting. Item 6(c) of Schedule 14A, 17 CFR § 240.-14a–101, provides, as follows:

"(c) If fewer nominees are named than the number fixed by or pursuant to the governing instruments, state the reasons for this procedure and that the proxies cannot be voted for a greater number of persons than the number of nominees named."

██ Article IV, section 1 of the Scotten, Dillon by-laws (PX–35) provides, in part:

"SECTION 1. *Number and Qualifications.* The business, property and affairs of the Company shall be managed and controlled by a Board of Directors consisting of no less than six nor more than fifteen persons. * * * The first Board of Directors shall consist of seven persons. Thereafter, within the limits set forth above, the number of directors for the ensuing year shall be determined by the stockholders at each annual meeting; provided, however, the Board of Directors may increase the number of directors within the limits set forth above between annual meetings of the stockholders and appoint interim directors to fill any vacancies thus created until the next annual meeting of stockholders."

From this section of the by-laws it is apparent that the increase in the Board membership was a matter which should have been presented to the 1970 Annual Shareholders Meeting. There is no dispute that the June 19, 1969 expansion of the Board was accomplished in accordance with all applicable by-law provisions and was thus done "pursuant to the governing instruments." Because of the requirements of Item 6(c) of Schedule 14A, the failure of the proxy materials to disclose the existence of the two newly created directorships and whatever reason existed for the failure to place before the stockholders the continued existence of these two positions constituted a clear violation of Rule 14a–3.

*Summers' Future Remuneration*

The plaintiffs contend that the proxy statement violated Rule 14a–3 because it did not disclose, as required by Item 7(c) of Schedule 14A, that Summers'

---

**27.** Statements made in annual reports have given rise to liability under Section 14(e) of the Act, 15 U.S.C. § 78n(e), see Butler Aviation International, Inc. v. Comprehensive Designers, Inc., 425 F.2d 842 (C.A.2, 1970) and under Rule 10b–5, 17 CFR § 240.10b–5 promulgated under Section 10 of the Act, 15 U.S.C. § 78j, see Heit v. Weitzen, 402 F.2d 909, 3 A.L.R. Fed. 803 (C.A.2, 1968), cert. den. 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969).

salary had been increased by the Board from $8,000 to $25,000 at the July 22, 1970 meeting (see PX–30, p. 9). The defendants argue that no disclosure was necessary because Summers was serving at the pleasure of the Board and was not therefore employed under "an existing plan."

Item 7(c) of Schedule 14A, 17 CFR § 240.14a–101, provides:

> "(c) Describe all remuneration payments * * * proposed to be made in the future, directly or indirectly, by the issuer or any of its subsidiaries pursuant to an existing plan or arrangement to * * * (ii) all directors and officers of the issuer as a group, without naming them." [28]

The "instructions" which accompany Item 7(b) read, as follows:

> "1. The term 'plan' * * * in paragraph (c) includes all plans, contracts, authorizations or arrangements, whether or not set forth in any formal document."

From this language it seems clear that a resolution of the Board fixing Summers' compensation at $25,000 per annum would qualify as a "plan" under the provisions of Item 7(c). The failure to disclose the proposed total remuneration for all directors and officers with Summers' new salary included therein thus constituted a violation of Rule 14a–3.[29]

### Gray's Corporate Position

The plaintiffs have also alleged that Section 14(a) was violated by the failure to disclose the fact that Gray was the chairman of the executive committee of the Board, a position which carried a $10,000 per annum salary. Testimony revealed that this committee did not hold a single meeting during the entire period of time relevant to this case, and was simply a vehicle employed to award Gray a salary from the corporation. (Tr. 54 & 78).

Item 6(a) (1) of Schedule 14A requires that the proxy materials disclose "all other positions and offices with [the corporation], presently held by [a director]." Since Gray's position carried a corporate salary, it was obviously a position or office required to be disclosed. Thus the failure to disclose Gray's position as chairman of the executive committee of the Board violated Rule 14a–3.

### Lerner's Association With Berg

The plaintiffs also charge that the proxy materials violated Section 14(a) of the Act and Rule 14a–9, 17 CFR § 240.14a–9, promulgated thereunder, because it failed to disclose that Lerner, at about the same time as the proxy materials were being distributed, was in the process of joining Berg's law firm in Buffalo, New York. While there is evidence that Lerner had the intention of joining Berg's firm prior to the time the proxy statement was prepared, (PX–44, pp. 23–24), both Lerner and Berg testified that Lerner did not actually join Berg's firm until September of 1970 (PX–44, p. 22; Tr. 48). Therefore, the failure to disclose Lerner's connections with Berg's law firm in the August 3, 1970 proxy materials did not violate Section 14(a) of the Act. Cf. Evans v. Armour & Co., 241 F.Supp. 705, 709 (E.D.Pa.1965).

### Miscellaneous Misstatements and Omissions

The defendants have admitted that erroneous statements were made in the

---

**28.** Since Summers' direct remuneration for 1969 did not exceed $30,000, his salary or its 1970 increase would not have to be disclosed individually. See Item 7(a) (1) of Schedule 14A.

**29.** The matter of proposed remuneration is clouded by virtue of the fact that the failure to submit the May 1, 1969 by-law amendments for stockholder ratification at the 1970 Annual Shareholders Meeting, as required by Article IX, section 2 of the Scotten, Dillon by-laws, may have created difficulties because certain of the executive positions created would have ceased to exist. However, the relief granted in this case may enable the matter to be resolved satisfactorily. See footnote 32, *infra*.

proxy materials for the 1970 Annual Shareholders Meeting, but insist that the statements were so minor as to not be "material." The false statements admitted by the defendants related to Lerner and Bissell's original election to the Board. The proxy materials stated that Lerner had been elected to fill one of the June 19, 1969 newly created positions on the Board and that Bissell had been elected to fill the vacancy caused by Fox's resignation. Actually, the reverse was true.

In addition, the proxy materials failed to show that Bissell had shifted seats on the Board after Lerner had been elected at the October 30, 1969 directors' meeting to fill the vacancy created by Moon's resignation. At that meeting Bissell was transferred from the newly created directorship to which he had been originally elected, to the directorship formerly occupied by Lerner. Though Lerner's change in positions was disclosed in the proxy materials, Bissell's was not.

*Materiality Under Rule 14a–9*

■ In order to find that Rule 14a–9, 17 CFR § 240.14a–9, has been violated by false or misleading statements or omissions, the statements or omissions must be material.[30]

The test of materiality under Rule 14a–9 was reviewed by Chief Judge Wright of this Court recently in Gould v. American Hawaiian Steamship Co., 319 F.Supp. 795, 802 (D.Del.1970). In his opinion Judge Wright adopted the standard set forth by the United States Supreme Court in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 384, 90 S. Ct. 616, 621, 24 L.Ed.2d 593 (1970):

"[The determination that a misstatement or omission is material] in-

dubitably embodies a conclusion that the defect was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote. This requirement that the defect have a significant *propensity* to affect the voting process is found in the express terms of Rule 14a–9, and it adequately serves the purpose of ensuring that a cause of action cannot be established by proof of a defect so trivial, or so unrelated to the transaction for which approval is sought, that correction of the defect or imposition of liability would not further the interests protected by § 14(a)." (Footnote omitted; emphasis in original).

See also Beatty v. Bright, 318 F.Supp. 169, 173 (S.D.Iowa 1970).

■ Applying this standard to the facts of the present case it is obvious that the false statement that Power had resigned from the Board was material in that "it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." In all likelihood, the false statement would have had "a significant propensity to affect the voting process." Stockholders who had formed opinions about Power and his abilities during the time he was a director, as well as president and treasurer of the corporation, might have given more consideration to Power's replacement by Summers had they known that Power had not resigned. Similarly, the controversy concerning Power's status as a director, which had embroiled the Board from March 1970 on, should have been disclosed. It was an important matter which a reasonable stockholder would

---

30. Rule 14a–9 reads in part:
"(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading." 17 CFR § 240.14a–9.

consider before deciding whether to give his proxy to Berg's faction. Therefore, as to Power's status as a director, the proxy materials, contained material misstatements and omissions, in violation of Rule 14a–9, 17 CFR § 240.14a–9.

Statements to the effect that Summers was an incumbent Board member when in fact he had never been validly elected could also have had "a significant propensity to affect the voting process." Before deciding how to vote a reasonable stockholder would have carefully weighed and considered the advisability of replacing Power with a new director who was a nominee of Berg's faction. Summers' incumbency, since the circumstances surrounding his purported election at the July 22, 1970 Board meeting were not disclosed, might have misled a stockholder into thinking that Summers' election at the annual meeting would raise no substantial objection from any of the directors. It is thus clear that the false assertion that Summers had been elected to the Board at the July meeting violated Rule 14a–9.

The failure to disclose to the shareholders their right to vote upon the continuation of two directorships on the Board and their right to elect persons to fill those directorships constituted a material omission violative of Rule 14a–9. Since electing additional directors could have forestalled any possibility that this highly polarized Board would become deadlocked, a proposal to elect additional directors was a distinct possibility.

Representing the proxy materials as "management" and designating Bissell and Summers as "management" nominees amounted to misstatements which meet the *Mills* test of materiality. These misrepresentations could easily have affected the voting decision of a reasonable stockholder, particularly since the truth would have made him aware of the division of opinion among the Board members. The knowledge that the solicitation was being done on behalf of one of the Board's factions and might result in that faction obtaining clear control of the corporation, would have caused a prudent shareholder to weigh his voting decision carefully. The stockholders should have had the opportunity to consider the merits of electing Bissell and Summers to the Board free from the influence which the label "management" so obviously exerts. Therefore, the mislabeling of the proxy materials "management" and the misdesignation of Bissell and Summers as "management" nominees violated Rule 14a–9.

As to the issuance and cancellation of Berg's stock warrants, the failure to list Summers' salary increase in a disclosure of future remuneration of the officers and directors as a group, the failure to note Gray's corporate position as chairman of the executive committee of the Board, and the admitted miscellaneous misstatements and omissions, the Court is not convinced that these misrepresentations and omissions standing alone would have been "material." However, Judge Wright in Gould v. American Hawaiian Steamship Co., supra, 319 F.Supp. at 809, held, *inter alia*, that "under § 14(a) it is proper to find a proxy statement to have violated that section if one misstatement or omission influences another, and to find the aggregate 'material'." Because of the combination of these misstatements and omissions with each other and with the misstatements and omissions found to be in and of themselves material, the Court finds that the "aggregate" referred to by Judge Wright has been reached. Therefore, the Court holds that the proxy materials, considered as a whole, violated Rule 14a–9.[31]

31. The plaintiffs have asserted that the failure to supply stockholders with information required by Schedule 14A, 17 CFR § 240.14a–101, is *per se* violative of Rule 14a–3(a), 17 CFR § 240.14a–3(a). Be that as it may, it has been held that proof of causation, a "but for" standard, is necessary before any relief may be granted for a violation of Rule 14a–3(a). Kaminsky v. Abrams, 281 F.Supp. 501, 506 (S.D.N.Y.1968); Mills v. Sarjem Corp., 133 F.Supp. 753, 768–

*Relief To Be Granted*

■ No question exists that this Court has the power to grant any and all relief necessary and appropriate to redress violations of Section 14(a) of the Act. J. I. Case Co. v. Borak, 377 U. S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). In view of the many violations of Section 14(a) found, the proxies obtained by the solicitation materials used for the 1970 Annual Shareholders Meeting of Scotten, Dillon must be declared void and the meeting itself declared illegal and voided. Scotten, Dillon must be ordered to resolicit proxies and reconvene the 1970 Annual Shareholders Meeting as soon as practicable for the purpose of acting on any and all matters which were or should have been considered by the shareholders at the 1970 meeting,[32] and any and all appropriate action should be taken to insure that this relief is properly effectuated. The plaintiffs' request that defendant Lerner be required to stand for reelection at such reconvened meeting is denied.

■ Any proxy soliciting materials hereafter used in connection with the 1970 Annual Shareholders Meeting shall contain up-to-date information which complies with all S.E.C. proxy rules and regulations and explicitly and definitively corrects all misstatements and omissions found to be in the proxy materials for the 1970 Annual Shareholders Meeting heretofore furnished to the stockholders. In its proxy materials the corporation should in addition set forth succinctly and with clarity that the reso-

licitation has become necessary as the result of a determination by this Court in this suit that in material respects the proxy solicitation materials for the 1970 meeting heretofore sent violated the Securities Exchange Act of 1934 and the proxy rules of the Securities and Exchange Commission promulgated thereunder, and were, therefore, unlawful.

The above shall constitute findings of fact and conclusions of law, as required by Rule 52(a), F.R.Civ.P.

Submit appropriate decree and order in accordance with this opinion.

---

769 (D.N.J.1955); note Rosenblatt v. Northwest Airlines, Inc., 435 F.2d 1121, 1125 (C.A.2, 1970). *Mills,* applying only to Rule 14a–9 cases, would not affect this causation requirement. Since in this case the Court has found sufficient cause under Rule 14a–9 to grant all appropriate relief requested, it is unnecessary to consider the possible scope of relief under Rule 14a–3(a).

32. Because of testimony that the by-law amendments adopted by the Board may have been considered by the S.E.C. as violative of some rule or regulation the

Court would obviously be remiss in ordering these by-law amendments to be brought before the shareholders. However, it should be noted that the record is unclear as to whether the S.E.C. objection was restricted to the October 30, 1969 amendments or extended to the May 1, 1969 amendments as well. In light of the serious effect which the termination of the May 1, 1969 by-law amendments may have on the corporation's present executive positions and their functions, this matter should be carefully considered prior to the reconvening of the 1970 meeting.